**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JESSIE J. BARNES,

                                        Plaintiff,

            - v -                                                Civ. No. 9:13-CV-164
                                                                        (GLS/DJS)

BRIAN FISCHER, *et al*.,

                                        Defendants.

**APPEARANCES:**                                        **OF COUNSEL:**

JESSIE J. BARNES
Plaintiff, *Pro Se*
09-B-2707
Upstate Correctional Facility
P.O. Box 2000
309 Bare Hill Road
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN                MELISSA A. LATINO, ESQ.
Attorney General of the State of New York   ADRIENNE J. KERWIN, ESQ.
Attorney for Defendants                          Assistant Attorneys General
The Capitol
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

### I. INTRODUCTION

    Presently before the Court is a multifaceted civil rights Complaint which implicates

over sixty Defendants, involves approximately twenty separate incidents, and covers a span

of two years. The parties have engaged in protracted discovery for four years, and Plaintiff

and Defendants have now moved and cross-moved for summary judgment. Plaintiff's papers include his Notice of Motion, Dkt. No. 435; his Declaration and Memorandum of Law, Dkt. No. 435-2; his Rule 7.1 Statement, Dkt. No. 435-3; and various exhibits, Dkt. Nos. 436-439. Defendants' Cross-Motion papers include a Notice of Cross-Motion for Summary Judgment, Dkt. No. 485; Affidavits from Counsel, with Exhibits, Dkt. Nos. 485-5-485-25; Declarations from various Defendants, with exhibits, Dkt. Nos. 485-26-485-36, 486-1-486-25, 487-2-487-34, 490-1-490-2; voluminous medical records, Dkt. No. 488; Videos of incidents occurring on June 15, 2010, July 31, 2010, August 3, 2010, November 5, 2010, May 19, 2011, May 25, 2011, August 23, 2011, and September 9, 2011;[1] a Rule 7.1 Statement, Dkt. No. 485-3; and a Memorandum of Law in support of Defendants' Cross-Motion and in opposition to Plaintiffs Motion, Dkt. No. 490. Plaintiff has submitted further papers in support of his Motion and in opposition to Defendants' Cross-Motion. Dkt. Nos. 523, 543, 560-564, 579, & 583. Defendants have responded to those arguments. Dkt. Nos. 568 & 580.

The Motions have now been fully submitted. For the reasons set forth herein, it is recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendants' Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**.

## II. THE AMENDED COMPLAINT

The fifty-five page Amended Complaint identifies sixty-one individual defendants and asserts eleven separate causes of action. Dkt. No. 186, Amended Complaint ("Am. Compl.").

---

[1] These videos were hand delivered and are in the possession of the Clerk's office. Plaintiff had previously reviewed the videos prior to the Summary Judgment Motion having been filed.

The various groups of Defendants sued include forty Corrections Officers; nine Sergeants; three Lieutenants; two Captains; the General Mechanic at Upstate Correctional Facility ("Upstate") (Matthew Gervais); the Maintenance Superintendent at Upstate (John Leclair); the Deputy Superintendent of Security at Upstate (Donald Uhler); the Director of the Special Housing Unit at the New York Department of Corrections and Community Supervision (hereinafter "DOCCS") (Albert Prack); the Superintendent at Upstate (David Rock); the Deputy Commissioner of DOCCS (Joseph Bellnier);[2] and the former Commissioner of DOCCS (Brian Fischer).

## A. Events

The Amended Complaint identifies numerous events or series of events, which make up or gave rise to Plaintiff's claims. Those events, along with the corresponding date, alleged misconduct, location, and participant(s) are as follow:

| Date | Alleged Event | Location | Participants |
|------|---------------|----------|--------------|
| June 15, 2010 | Plaintiff had his records destroyed, including the ripping up of legal briefs. | SHU-10-Building | Derouchie,[3] Wood, and Bango. |

---

[2] Defendant Bellnier's name is spelled "Bellinier" in the Amended Complaint and on the docket. The Court will spell the name in this Report-Recommendation and Order as it is spelled in the Defendant's Declaration, as "Bellnier."

[3] Defendant Derouchie's name is spelled "Derouche" in the Amended Complaint and on the docket. The Court will spell the name in this Report-Recommendation and Order as it is spelled in the Defendant's Declaration, as "Derouchie."

| June 15, 2010 | Excessive force; mace spraying. | SHU-10-Building near C-1 Gallery | L. Hopkinson, P. Gokey, Scott Simons, George Martin, and Bango. *Watched by Zerniak[4] and Salls.* |
|---|---|---|---|
| July 21, 2010 | Complaint to Rock and Fischer by Plaintiff regarding conduct of Gokey, Wood and Derouchie. | SHU-10-Building | Rock and Fischer. |
| July 30, 2010 | Plaintiff moved to 10-B1-24 cell next to disruptive prisoner Herman Cruz. | SHU-10-Building | Eddy. |
| July 31, 2010 | Improper cell search; Plaintiff spits on Defendant Keating; Plaintiff is threatened. | SHU-10-Building | Keating, L. Gokey, Boyd, and Dunning. |
| July 31, 2010 | Excessive use of force. | SHU-10-Building | L. Gokey, Dunning, Streeter, Keating, Fournier, Rakoce, and Snyder. |
| Aug. 3, 2010 | Plaintiff is struck in the arm with a baton. | SHU-10-Building | Eddy, Zerniak and R. Skiff. *Watched by Sorrells.* |
| Nov. 5, 2010 | Plaintiff has his head and face slammed against the wall. | Outside his cell at 10-C1-8 | Ramsdell. |

---

[4] Defendant Zerniak's name was spelled "Zarniak" in the Amended Complaint and on the docket. The Court will spell the name in this Report-Recommendation and Order as it is spelled in the Defendant's dDclaration, as "Zerniak."

| Apr. 23, 2011 | Plaintiff's hand was slammed in the tray slot after complaining that his food had been poisoned. | SHU-10-Building | Derouchie and Wood. |
|---|---|---|---|
| Apr. 23, 2011 | Excessive use of force on Plaintiff. | Infirmary, isolation cell # 2 | Yaddow, Riley, and Grant. *Watched by* Bond. |
| Apr. 23, 2011 | Plaintiff threatened by Derouchie. Subjected to excessive force. | Infirmary | Santamore, Bowman, Marlow, Southworth, Nephew, and Derouchie. *Watched by* Zerniak and Salls. |
| May 19, 2011 | Plaintiff subjected to an improper cell search. | SHU-10-Building | Zerniak. |
| May 19, 2011 | Excessive force - handcuffs used as a weapon. | SHU-10-Building | J. Clark and Malloux. |
| May 19, 2011 | Excessive force - rotating handcuffs causing holes in Plaintiff's wrists. | Holding Pen, 10-Building. | L. Gokey, Arquitt, B. Clark, J. Clark, Malloux or John Doe 1 or John Doe 2. *Watched by* Albert, Vanornum, Johnson, Norcross, Wood, Bond, Tuper, Zerniak, and Salls. |
| May 25, 2011 | Provided with a kosher loaf; improper cell search. | SHU-10-Building. | Sisto and Derouchie; Salls. |

| May 25, 2011 | Excessive force used, slammed to the floor. | Holding Pen, 10-Building. | L. Gokey, B. Clark, Bogett, Manley, and Mainville. *Watched by* Sisto, Salls, Vanornum, Zerniak, Keating, Richards, Bond, Tuper, Barney, Brand, Malloux, and Derouchie. |
| --- | --- | --- | --- |
| Aug. 23, 2011 | Excessive use of force. | Infirmary - X-Ray room | Tulip, Clark, Hungerford, Lashway, and Perham or Arquitt. |
| Aug. 23, 2011 | Excessive use of force. Plaintiff was punched in the face, struck with a baton, and had a bag put over his head. | Infirmary | Rendle, Hungerford, Gettmann, and Arquitt. *Watched* by Bishop, Currier, Hungerford and Perham. |
| Sept. 9, 2011 | Plaintiff struck in the face with a closed fist. | SHU-10-Building | Ramsdell. |
| Sept. 9, 2011 | Plaintiff's hands were pulled out of the fixed protective hatch cover ("FPHC") using a retention strap, and the lid to the FPHC was repeatedly slammed down, causing amputation of finger tip. | SHU-10-Building | B. Clark, Ramsdell and Dunning. *Watched by* Allen, and Paige or John Doe. |
| Oct. 3, 2011 | Plaintiff was allegedly told that he was going to die in 8-cell. | S. Hearing Room | Uhler. |
| March 2012 to present | Unequal treatment of Plaintiff, including improper cell searches. | SHU-10-Building | Uhler, Zerniak, Eddy and other security personnel. |

-6-

**B.  Causes of Action**

Plaintiff's Amended Complaint contains the following causes of action arising from these alleged incidents:

| Number | Nature of Claim | Defendants Implicated |
|---|---|---|
| 1. | Gross Negligence/Management. Plaintiff alleges that the failure to supervise and/or to grant his grievances, created an improper policy or custom in the facility that violated his rights under the 8th and 14th Amendments to the United States Constitution.  Am. Compl., at ¶ 63. | Fischer and Bellnier. |
| 2. | Failure to Train/Supervise. Plaintiff alleges that because of the failure of the two named supervisory personnel to control and train staff regarding the application of force and proper cell searches, he was subjected to excessive use of force and improper searches on repeated occasions, all in violation of his 1st, 5th, 8th, and 14th Amendment rights.  Am. Compl. at ¶¶ 64-66. | Fischer and Bellnier. |
| 3. | Failure to Protect Plaintiff. Plaintiff alleges that Fischer and Bellnier failed to protect him from excessive force or misconduct by Zerniak, Salls, Gokey, Derouchie, Arquitt, Ramsdell, and Allen, among others, and that such failure amounted to deliberate indifference, and thereby resulted in a violation of Plaintiff's 8th and 14th Amendment rights.  In addition, Plaintiff alleges that Rock and Uhler violated his Constitutional rights by failing to move him from Upstate, and also by allowing the use of a dangerously designed FPHC. Am. Compl. at ¶¶ 67-78. | Fischer and Bellnier; Rock and Uhler. |

| 4. | Product Liability/Manufacturing the FPHC in a Dangerous and Defective Manner.<br>Plaintiff alleges that the design of the hatch cover, with its plexi-glass top, was unreasonably dangerous and resulted in the amputation of his left finger tip.  Am. Compl. at ¶¶ 79-80. | Fischer, Bellnier, Rock, Uhler, Leclair, and Gervais. |
|---|---|---|
| 5. | Strict Product Liability.<br>Plaintiff alleges that the FPHC was improperly designed by the named Defendants, was improperly manufactured, was improperly inspected, and failed to have the necessary user guide.  Am. Compl. at ¶¶ 81-82. | Fischer, Bellnier, Rock, Uhler, and Leclair. |
| 6. | Failure to Warn.  Am. Compl. at ¶ 83. | Fischer, Bellnier, Rock, Uhler, Leclair, and Gervais. |
| 7. | Negligence.<br>Plaintiff alleges that Defendants breached their duty of care by allowing use of the dangerous FPHC. Am. Compl. at ¶ 84. | Fischer, Bellnier, Rock, Uhler, Leclair, and Gervais. |
| 8. | Negligent Entrustment.<br>Plaintiff alleges that Defendants breached their duty of care by providing the FPHC to untrained employees.  Am. Compl. at ¶ 85. | Fischer, Bellnier, Rock, Uhler, Leclair, and Gervais. |
| 9. | Negligent Infliction of Emotional Distress.<br>Plaintiff alleges that Defendants are liable due to their failure to move Plaintiff out of Upstate; to protect Plaintiff against actions of violence and/or the destruction of his property.  Am. Compl. at ¶¶ 86-87. | Fischer, Bellnier, Rock, and Uhler. |
| 10. | First Amendment Retaliation.<br>Plaintiff alleges that the incidents of misconduct and excessive force set forth above were done in retaliation for his filing of grievances.  Am. Compl. at ¶¶ 88-106. | Numerous Defendants as set forth in the chart *infra* at pp. 46-48. |

-8-

| 11. | Denial of Due Process.<br>Plaintiff alleges that his Due Process rights were violated when a video tape was not preserved; by Uhler being the Hearing Officer for Plaintiff's complaints when he was biased and not impartial; by Uhler imposing a penalty of 5 years of confinement in Special Housing; and by Defendant Prack failing to grant his appeal. Am. Compl. at ¶¶ 107-112. | Fischer, Rock, Uhler, and Prack. |
| --- | --- | --- |
| 12. | Excessive Use of Force-Policy or Practice.<br>Plaintiff incorporates all of the misconduct that is alleged to have occurred between June of 2010 and October of 2011, some of which is alleged to be continuing, and which is set forth in detail in the "Events List." The allegations are against the individuals who engaged in the active misconduct, the Officers who failed to intervene, and the supervisory personnel who created the policy or practice. Am. Compl. at ¶¶ 113-147. | Numerous Defendants as set forth in the "Event List" above. |

### III. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules,

-9-

served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant.  FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-

resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Furthermore, where a party is proceeding *pro se*, the court must "read his [or her] supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).  Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).  Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Finally, as this Motion for Summary Judgment involves a determination concerning certain events that were videotaped by the fixed cameras and/or handheld cameras at Upstate, the Court must consider how to view and consider those videos for purposes of a summary judgment motion.  Both Plaintiff and Defendants have, at times, relied upon those videos to support their positions.  *See*, *e.g.*, Dkt. No. 485-3, Defs.' Rule 7.1 Statement of Material Facts ("SMF"), ¶¶ 56-60; 114-147; 160-166; Dkt. No. 559.  All of those videos have been carefully reviewed by the Court in connection with this decision because, as the Supreme Court has noted, reliance upon a video record in connection with a summary judgment motion is wholly appropriate.  *Scott v. Harris,* 550 U.S. 372, 379-80 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

-11-

Courts should be cautious, however, about placing too much weight on one particular piece of the evidentiary puzzle, especially where a video may be incomplete, or subject to multiple interpretations. *See Russo v. Cty. of Warren*, 2015 WL 7738043, at *6 (N.D.N.Y. Dec. 1, 2015) (noting that "the allegations giving rise to the substance of Plaintiff's excessive force claims transpired out of the cameras' view and thus are not 'blatantly contradicted' by the security video footage"). Thus, as recently noted by one District Court Judge within this district:

> [I]n the ordinary case, the appropriate course of action is still to permit the jury to resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes in which juries engage: evaluating credibility, drawing inferences… and deciding what all the evidence "means" and what it reveals about what happened.

*Hulett v. City of Syracuse*, 253 F. Supp 3d. 462, 482 (N.D.N.Y. 2017) (Hurd, J.) (citation omitted) (internal quotation marks omitted).

### B. Plaintiff's State Law Claims for Product Liability and Negligence

Causes of action numbered four, five, six, seven, eight, and nine in the Amended Complaint are state law claims for negligence and product liability relating to the fixed protective hatch cover utilized at Upstate, which was the instrumentality that caused the amputation of the tip of Plaintiff's left ring finger. The state law claims are, respectively: failure to protect, product liability, failure to warn, negligence, negligent entrustment, and negligent infliction of emotional distress. Am. Compl. at ¶¶ 78-87.

Plaintiff moves for Summary Judgment against various Defendants, and in doing so makes the following argument:

-12-

> There is no dispute that Matthew Gervais, Upstate General Mechanic is the
> person whom is maker, manufacturer or operator of original fixed protective
> hatch cover (FPHC) with second unnecessary plexi-glass with sharp edges on
> lid that fit flush down in rectangle cut out in steel frame of box and second
> needless plexiglass functions as a makeshift cutting tool which... [was used]
> to amputate the Plaintiff's left index fingertip.

Dkt. No. 435-2, Declaration of Jessie J. Barnes ("Barnes Decl."), ¶ 4.

Plaintiff contends that the State, and its correctional employees, had a duty to protect

inmates from risks of harm that were reasonably foreseeable, and that Defendants are

therefore liable to Plaintiff for the injuries he suffered as a result of the State's failure to

satisfy that state law duty. *Id.* at ¶ 7. Those alleged failures, in addition to the alleged

improper design, include a failure to warn of the defects of the FPHC, and a failure to train

employees as to the proper use of the FPHC. *Id.* at ¶ 7(h); Dkt. No. 435-3, Plaintiff's Rule

7.1 Statement of Material Facts ("Pl.'s SMF"), ¶ 6.

New York's strict products liability theory of negligence generally holds that a

manufacturer of a defective product is liable for injury that results from the use of the product

when it is used for its intended and reasonably foreseeable purpose. *Voss v. Black & Decker*

*Mfg. Co.*, 59 N.Y.2d 102, 107-08 (1983). A product is defectively designed if a reasonable

person with knowledge of the product's potential for causing injury and of a foreseeable

alternative design would have concluded that the product should not have been marketed in

that condition. *Cover v. Cohen*, 61 N.Y.2d 261, 266-67 (1984).

The initial question for this Court to decide is whether New York State Correction

Law § 24 bars the litigation of all such claims in federal court, as asserted by Defendants'

counsel.  Dkt. No. 490, Defs.' Mem. of Law, p. 29.  Section 24 states in pertinent part:

> No civil action shall be brought in any court of the state . . . against any officer
> or employee of the department,. . . in his or her personal capacity, for damages
> arising out of any act done or the failure to perform any act within the scope
> of employment and discharge of the duties by such officer or employee.

N.Y. Correct. Law § 24(1).

The Statute further provides that any claim for damages arising out of a state employee's acts performed within the scope of his or her employment can be maintained only in the New York Court of Claims as a claim against the State of New York.[5]  *Id*. at § 24(2).  "It is well settled that Section 24 shields employees of a state correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope of the statute."  *Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir. 1997) (citing *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996)).  "Such immunity is available whether the action is pursued in a state court or, under pendant jurisdiction, in a federal court."  *Id.*; *Baker v. Coughlin*, 77 F.3d at 15.

Accordingly, § 24 of the Corrections Law presents a complete bar to Plaintiff's state law claims.  Any argument that the particular Officers involved, from the alleged designer of the FPHC (Matthew Gervais) to the individuals who allegedly used force resulting in the amputation of a portion of Plaintiff's finger (Officers Ramsdell, B. Clark, and Dunning), or those officials in a supervisory capacity who allegedly failed to protect Plaintiff from the

---

[5] The Court of Claims routinely handles claims involving design defects.  *E.g.*, *Aldrich v. State*, 110 A.D.2d 331 (3d Dep't 1985) (discussing claims against the state by property owners to recover for flood damage due to an allegedly negligently designed bridge).

-14-

dangerous instrumentality, were somehow acting outside the scope of their duties and thus are not protected by § 24, is foreclosed by the expansive reading of the statute. *See Ierardi v. Sisco*, 119 F.3d at 187 (noting that § 24 protects officers accused of excessive force, even where such conduct violates DOCCS regulations). The New York Court of Appeals has specifically stated its view on this issue:

> [N]o longer is an employer necessarily excused merely because his employees, acting in furtherance of his interests, exhibit human failings and perform negligently or otherwise than in an authorized manner. Instead, the test has come to be "'whether the act was done while the servant was doing his masters work, no matter how irregularly, or with what disregard of instructions.'"

*Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979) (citations omitted).

Here, the allegations against the individual Defendants in connection with the creation and production of the FPHC, the failure to train and warn regarding the dangers of the FPHC, and the use of force involving that device which resulted in Plaintiff's severe injury are all actions taken in the scope of the Corrections Officers' duties. *Heyliger v. Gebler*, 496 F. Supp. 2d 250, 253 (W.D.N.Y. 2007). Thus, all of Plaintiff's state law claims are barred by New York Correction Law.

Finally, Plaintiff cannot succeed on a claim that these negligence and product liability causes of action are brought under the umbrella of 42 U.S.C. § 1983. While constitutional claims under the Civil Rights Statute are not barred by Corrections Law § 24, *Haywood v. Drown*, 556 U.S. 729, 740-41 (2009), the Amended Complaint makes clear that these particular claims are brought pursuant to state law, using such terms as "negligence" and "strict products liability." A § 1983 claim for failure to protect a prisoner from a dangerous

condition would require pleading and proving that Defendants acted with deliberate indifference in violation of the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Such language and proof is conspicuously absent in claims numbered four, five, six, seven, eight and nine.[6]  In similar contexts, federal courts have routinely noted that conduct that may rise to the level of a state law claim for medical malpractice would nevertheless be insufficient to satisfy the Eighth Amendment standard of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *O'Boyle v. Bradshaw*, 952 F. Supp. 2d 1310, 1316 n.4 (S.D. Fla. 2013) (holding in *dicta* that plaintiff's claims of negligence and products liability would be insufficient to state a § 1983 claim).

Accordingly, this Court recommends dismissal of all state law claims alleged by Plaintiff.[7]

### C.  Plaintiff's Claims for Excessive Force and Failure to Intervene

#### 1.  Excessive Force Legal Standard

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment.

---

[6] The third cause of action does allege, in wholly conclusory terms, that certain supervisory personnel callously disregarded the risk that the FPHC posed. Am. Compl. at ¶¶ 77-78. Such supervisory allegations are insufficient to defeat Defendants' Motion for Summary Judgement, because in order for a supervisor to be held liable under § 1983, there must have been an underlying constitutional violation. *Blyden v. Mancusi*, 186 F. 3d 252, 265 (2d Cir. 1999). As noted above, the state law claims for, *inter alia*, defective design do not state a constitutional claim. Accordingly, the failure to protect claim in the third cause of action should also be dismissed.

[7] Plaintiff has alleged a § 1983 use of force claim resulting in the amputation of his finger tip by the FPHC, and that claim is not effected by this analysis.

-16-

*Robinson v. California*, 370 U.S. 660, 666-67 (1962); *see also Tramell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003). In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred where there are allegations of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6-7; *see also Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994). To validly assert a violation of the Eighth Amendment based on the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi*, 186 F.3d at 262-63.

The inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263 (internal quotation marks omitted). In assessing the objective component, the court should consider the seriousness of the injury; however, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury;" thus, "the seriousness of the injury is relevant to the Eighth Amendment inquiry, but does not end

-17-

it." *Davidson v. Flynn*, 32 F.3d at 29-30, n.1 (quoting *Hudson v. McMillian*, 503 U.S. at 4) (internal quotation marks omitted). "[A] *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated" regardless of whether a "significant injury" is apparent. *Blyden v. Mancusi*, 186 F.3d at 263 (citing *Hudson v. McMillian*, 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a *per se* violation of the Eighth Amendment occurs." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001).

With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including

> the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d at 291 (internal quotation marks and citation omitted); *see also*

*Hudson v. McMillian*, 503 U.S. at 7.

When prison officials are accused of using excessive force, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 6-7 (citing *Whitley v. Albers*, 475 U.S. at 320-21). "Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may . . . be sufficient evidence of a culpable state of mind." *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997).

### 2. The June 15, 2010 Incident

According to Plaintiff, on June 14, 2010, he had an appellate brief destroyed by Corrections Officers Brand and Greene at Upstate. Dkt. No. 560-3, Reply Declaration of Jessie J. Barnes ("Barnes Reply Decl."), ¶ 5. Plaintiff maintains he then refused acceptance of his property on June 14, 2010 to prevent further destruction of the appellate briefs. *Id.* On June 15, 2010, Corrections Officers Wood and Derouchie, under the supervision of Bongo, returned to his cell to deliver his documents. *Id.* at ¶ 6. Defendants Wood and Derouchie are alleged to have destroyed and/or engaged in the "discombobulation" of Plaintiff's legal documents, and Plaintiff responded by throwing soap and water at them through the feed up slot. *Id.* This conduct resulted in a search of Plaintiff's cell. *Id.* at ¶ 7.

According to Plaintiff, he agreed to voluntarily exit his cell for the search, and to effectuate this he put his hands behind his back and was handcuffed through the feed up slot prior to Corrections Officers entering his cell. *Id.* at ¶ 12. Plaintiff claims at the moment this

-19-

was complete, he then had aerosol spray applied to him, and was repeatedly kicked, stomped, and punched while an extraction team was within his cell, and outside the range of the fixed mounted camera. *Id.* at ¶¶ 12a-12e. Plaintiff further asserts that Defendant Bongo administered the chemical agent, and that Defendants P. Gokey, Martin, Simons, and Hopkinson participated in the assault, while Defendants Zerniak, Sorrells, and Salls watched and failed to intervene. *Id.* at ¶¶ 12a-12e. Plaintiff also maintains that Defendants falsified reports regarding the matter. *Id.*

Defendants dispute this version of events. While they acknowledge that Defendants Wood and Derouchie did inspect Plaintiff's paperwork and that they may have removed some metal fasteners and bindings pursuant to prison regulations, they maintain they did not destroy or rip up Plaintiff's papers. Defs.' SMF at ¶¶ 7-17. After Plaintiff threw an unknown liquid at the officers, and after Plaintiff allegedly covered his cell window in violation of the written standards of inmate behavior, Bango authorized a cell search. *Id.* at ¶¶ 20-26. Defendants maintain that Plaintiff refused the cell search, despite considerable efforts to get him to consent. *Id.* at ¶¶ 37-41. The cell extraction, with the use of the chemical agent, was then authorized. *Id.* at ¶¶ 42-44. The extraction team consisted of Corrections Officers P. Gokey, Martin, Hopkinson, and Simons. *Id.* at ¶ 43. Capt. Zerniak gave the final order to extract; Lt. Salls gave the order to apply the chemical spray; Defendant Bongo administered the agent; and Defendant Sorrells videotaped the incident.[8] *Id.* at ¶¶ 48-49. Defendants

_____

[8] This video from a hand-held recorder has not been provided to the Court.

-20-

maintain that after the application of the chemical agent, Plaintiff became compliant and stuck his hands behind his back and out of the feed up hatch to be handcuffed. *Id.* at ¶¶ 49-51. Defendants allege that after being handcuffed and when the Officers went into the cell, Plaintiff kicked Officer Hopkinson in the thigh area, and was then restrained through the use of body holds. *Id.* at ¶¶ 53-54.

Defendants deny that any excessive force was used upon Plaintiff by the extraction team or that any of the other Officers present witnessed any improper conduct that created a duty to intervene. *Id.* at ¶¶ 58-67. Captain Zerniak allegedly left the area prior to the extraction.[9] *Id.* at ¶ 66. Finally, Defendants allege that Plaintiff was not seriously injured.

Where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," summary judgment is improper "even where the plaintiff's evidence of injury [is] slight and proof of excessive force [is] weak." *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009). In the present case, Plaintiff alleges that four Corrections Officers entered his cell and assaulted him *after* he was already handcuffed and was not resisting. He further alleges the four other Corrections Officers were present and did not intervene. The Video presented in this matter, which does show Plaintiff being handcuffed through the feed up slot prior to the extraction team's entering the cell, but does not depict what occurred within the confines of the cell, does not rule out Plaintiff's claim of a wanton and excessive beating.

---

[9] This claim appears to be contradicted by the fixed camera videotape of the incident, which shows eight Officers responding to the scene, and all eight Officers remaining until Plaintiff is removed from his cell.

*Compare Flemming v. Kemp*, 2012 WL 4094196 (N.D.N.Y. Aug. 30, 2012) (granting summary judgment where plaintiff alleged that officers entered his cell, beat him, dragged him from his cell and beat him again, but where video disclosed that no officers entered his cell and no one beat plaintiff as he left his cell on his own accord).  Here, while the Video may very well be consistent with Defendants' version of events, it does not necessarily preclude Plaintiff's primary claims. *Russo v. Cty. of Warren*, 2015 WL 7738043 at *6. Therefore, genuine issues of material fact remain regarding when Plaintiff complied with the cell extraction; what force was used upon Plaintiff, and particularly, what force was used after the handcuffs were applied; who witnessed this use of force; and what injury was sustained by Plaintiff as a result of that conduct.  *E.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (reversing the district court's grant of summary judgment for an officer's deployment of pepper spray "mere inches away from the face" of a suspect who was "already in handcuffs and offering no further active resistance").

Plaintiff has also alleged that certain Corrections Officers disregarded their constitutional duty to intervene and protect him against excessive force being used by fellow Officers.  "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).  In order to establish liability for failure to prevent another officer from committing a constitutional violation, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person

-22-

in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene." *Id.* In the present case, Plaintiff sufficiently alleges that Officers were present when the alleged unconstitutional assaults were occurring, and he therefore establishes questions of fact concerning whether those Officers, by merely standing by, violated their constitutional duties. *Compare Scarbrough v. Thompson*, 2012 WL 7761439, * 10 (N.D.N.Y. Dec. 12, 2012) (summary judgment granted where inmate failed to allege that supervisor was present for the extraction and directly failed to intervene to protect inmate from excessive force).

Defendants' reliance on *Flemming v. Kelsh* is misplaced. That case involved a forcible extraction of an inmate who had refused to return an eyedropper to prison officials, and who further refused to come out of his cell. United States Magistrate Judge Andrew Baxter did hold in *Flemming* that an extraction team member who enters a cell on orders from a supervisor, in response to such an inmate refusal, and whose knowledge is limited to those facts, does not act in a malicious and wanton manner when he or she enters the cell and uses necessary force to subdue the recalcitrant inmate. *Flemming v. Kelsh*, 9:13-CV-0758, Dkt. No. 45, at p. 14 (N.D.N.Y Apr. 5, 2016)*, report and recommendation adopted*, 2016 WL 2757398 (N.D.N.Y. May 12, 2016). However, the facts of *Flemming* are case-specific: there, the plaintiff only described being hit by a shield and taken to the floor "[w]ithout describing any further blows . . .", and adding at his deposition that he did not "recall . . . exactly what really took place." *Id.* at pp. 12-13. *Flemming* does not create a blanket authorization for extraction teams to simply "swing away" upon being given the initial entry

-23-

order.  Plaintiff's additional allegations regarding macing, kicking, and stomping by Officers after he was already subdued by the use of mechanical restraints, are sufficient to create a question of fact even assuming the initial cell extraction was authorized and constitutional.

Finally, Defendants are not entitled to qualified immunity at this stage of the proceedings.  *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

### 3.  The July 31, 2010 Incident

On July 31, 2010, Plaintiff was upset by the conduct of an inmate housed next to him. Am. Compl. at ¶ 25.  In protest,  he put his arm through the feed up hatch and refused to pull it back when ordered to do so, and instead attached drag lines and bed sheets through the openings to prevent the closing of the two hatch covers in his door.  Defs.' SMF at ¶ 72; Dkt. No. 560-1, Pl.'s Counter Rule 7.1 Statement of Material Facts ("Pl.'s Counter-SMF"), ¶ 72; Dkt. No. 486-7, Decl. of Sgt. Laura Gokey, ("L. Gokey Decl."), ¶ 9.  Prison staff viewed this conduct as a serious security concern and a request was made to, and approved by, the Watch Commander to move Plaintiff to a level 1 cell.  L. Gokey Decl. at ¶¶ 10 & 12.  Upon arrival at the new unit, Plaintiff then covered the cell window with paper and began to flood his cell, all in violation of prison regulations.  Defs.' SMF at ¶¶ 99-100; Pl.'s Counter-SMF at ¶¶ 99-100; L. Gokey Decl. at ¶¶ 19 & 20.   Sgt. Laura Gokey then authorized the search of Plaintiff's new cell and, as a result, Plaintiff was handcuffed behind his back and escorted to a lower holding pen per DOCCS protocol.  L. Gokey Decl. at ¶¶ 26 & 28.

When Plaintiff was placed in the lower holding pen, he turned and admittedly spit on Officer Keating and Lt. Ranieri. Defs.' SMF at ¶ 114; Pl.'s Counter-SMF at ¶ 114; L. Gokey Decl. at ¶ 29; *see also* 7/31/10 Fixed Camera Video and separate Handheld Video. This conduct was also reported to the Watch Commander, who authorized the application of a spit net on Plaintiff and his transport back to his level I cell. Defs.' SMF at ¶¶ 119-122; L. Gokey Decl. at ¶ 31. In addition to spitting on the two Corrections Officers, during the time that Plaintiff was in the holding cell, he also threatened to spit on a nurse and to break the neck and kill a Corrections Officer. *See* Fixed Video at 19:37:13 (spitting at officers); 19:37:22 ("I'll spit in your face, bitch"); 19:38:40 ("pussy-ass cracker, I ought to break your neck"); 19:54:10 ("kill one of y'all crackers - blow your brains out"). In addition, Plaintiff pulled his handcuffed hands from behind his back to his front. *Id.* at 19:38:50.[10]

An extraction team was assembled pursuant to the Watch Commander's order, consisting of Defendants Streeter, Dunning, Boyd, and Fornier, for the purpose of entering the cell, applying the spit net, and transporting Plaintiff back to his level 1 cell, which at that time had been searched. L. Gokey Decl. at ¶¶ 31-34. That extraction occurred at 8:10 p.m., and the entire incident is depicted on both the handheld and fixed Videos.[11] Plaintiff did not immediately comply with the orders of the extraction team, but at one point did go to the

---

[10] Plaintiff had maintained throughout the course of the case that the use of force against him on this instance was particularly offensive because he was handcuffed behind his back. *See* Am. Compl. at ¶ 31 ("innocuous in handcuffs behind his back"). Plaintiff now concedes he was wrong about this critical fact. Dkt. No. 559.

[11] When Plaintiff is returned to his level 1 cell, the handheld Video is blocked for a short period of time by the back of an escorting Officer, but regains view of Plaintiff while he is in his cell, and captures the procedure of getting the handcuffs removed.

back corner of the observation cell and kneeled down facing the wall. Fixed Video at 20:10:47. The four Corrections Officers then entered the cell and slowly approached Plaintiff. While they were equipped with plastic shields, they did not use them. Instead, they used body holds and handhold techniques to control and hold Plaintiff on the floor and apply the spit net. No punching, kicking, or stomping is shown. The Officers entered the cell at 20:11:34, and left the cell approximately two and a half minutes later at 20:14:04. Plaintiff was immediately returned back to his tier 1 cell at 20:14:25. While in his cell, a retention strap was applied to his handcuffed wrists, and was later used to get Plaintiff's hands through the feed up slot so that the handcuffs could be removed from the outside. L. Gokey Decl. at ¶ 41.

As for any injury caused by the use of force, Plaintiff shouted during the course of the event that the Officers had broken his hand. *See* Fixed Video at 20:12:58. However, a medical review conducted shortly after the event indicated that Plaintiff was in no acute distress, and only had some pain in his thumb and moderate swelling to his right cheek. The medical assessment at that time was that no treatment was necessary. Dkt. No. 485-17, Affirmation of Adrienne J. Kerwin ("Kerwin Aff."), Exhibit C, at Bates Nos. 413-14.

Plaintiff generally states that the force used upon him on July 31, 2010 was applied "maliciously and sadistically." Pl.'s Counter-SMF at ¶ 132. Unlike the July 15, 2010 incident, however, a review of the admissible facts presented on this Motion, as well as the comprehensive Videos, discloses no force that could reasonably be characterized as being used maliciously and sadistically for the very purpose of causing harm. Regarding this

incident, the fact pattern presented is almost identical to the case of *Flemming v. Kelsh,*

*supra*.  There is no serious dispute that Plaintiff's conduct warranted his removal from his

cell as well as the decision to utilize a spit mask on Plaintiff during his escorted return to that

cell.  These activities necessitated that a certain amount of force be used.  *See Barnes v.*

*Alves*, 58 F. Supp. 3d 296, 312 (W.D.N.Y. 2014) ("If Plaintiff did spit on Defendant [ ], that

alone would justify a use of force to restrain Plaintiff in order to neutralize a threat to the

officers"); *Bonet v. Shaw,* 669 F. Supp. 2d 300, 305 (W.D.N.Y. 2009) (finding use of force

justified where inmate-plaintiff committed "the most unsavory act of spitting in the face of

one of the officers"); *Lopez v. Reynolds,* 998 F. Supp. 252, 257 (W.D.N.Y.1997) (inmate-

plaintiff spitting in the face of an officer "demonstrates a reasonably perceived threat to the

maintenance of prison discipline").

That decision to apply the spit net, and thereby the use of force to accommodate that

task, was made by officials high up the chain of command, based upon conduct that Plaintiff

himself acknowledges occurred. The Corrections Officers on the extraction team merely

complied with that order, and in doing so utilized the force necessary to carry out their

instructions.  Accordingly, summary judgment is warranted for the July 31, 2010 incident.

### 4.  The August 3, 2010 Incident

On August 3, 2010 Plaintiff was housed at 10-Building at Upstate.  At approximately

7:30 a.m., while two Corrections Officers were delivering meals,  Plaintiff is observed

sticking his arm out of the feed up hatch on his cell door.  Defs.' SMF at ¶ 155; Pl.'s

Counter-SMF at ¶ 155; Surveillance Videotape of Aug 3, 2010.  Plaintiff admits engaging in this conduct but claims that it was motivated by his desire to get medical attention, soap, and toothpaste.  Pl.'s Counter-SMF at ¶¶ 155 & 158.  Nevertheless, he concedes that this conduct violated the rules of inmate behavior.  *Id.*

At 7:39:18, six Corrections Officers walk down the tier towards Plaintiff's cell, and Plaintiff's arm is still visible.  Surveillance Videotape of August 3, 2010.  At 7:39:42, Capt. Zerniak is seen verbally interacting with Plaintiff.  *Id.*  Plaintiff admits that Zerniak gave him several orders to remove his arm, which orders were not complied with.  Pl.'s Counter-SMF at ¶¶ 159-60.  At that point, Capt. Zerniak ordered Officer Skiff to strike Plaintiff one time in his arm with a baton, which occurred at 7:39:53.  Pl.'s Counter-SMF at ¶¶ 159-61; Surveillance Video of August 3, 2010.  Plaintiff immediately removed his arm from the feed up slot, the cover was closed, and the Officers left the tier.  *Id.*

Plaintiff does not allege any specific injury that resulted from this use of force.  *See* Am. Compl. at ¶ 33; Pl.'s Counter-SMF at ¶ 165; Dkt. No. 560-2, Pl.'s Reply Rule 7.1(f) Statement of Material Facts ("Pl.'s Reply SMF"), ¶¶ 66-70; Dkt. No. 560-3, Reply Declaration of Jessie J. Barnes ("Barnes Reply Decl."), ¶ 15.  The medical records disclose no serious injury.  Dkt. No. 485-19, Kerwin Aff. Exhibit E.

The Court agrees with Defendants that the use of force depicted in the August 3, 2010 Video, the basic facts of which are essentially agreed to by both Plaintiff and Defendants, does not rise to an Eighth Amendment violation.  Rather, it constituted a minimal use of force against an inmate who had violated inmate rules and was refusing to comply with a direct

order.  The baton strike was neither prolonged nor excessive in light of the facts of the case, and resulted in immediate compliance from the inmate, who sustained no significant injury. As there is no evidence that the force was used for any purpose other than to maintain prison discipline, summary judgment in favor of Defendants should be granted concerning this incident. *Boyd v. Selmer*, 842 F. Supp. 52, 56-67 (N.D.N.Y. 1994) (holding that officers striking inmate three to four times with a baton in order to get the inmate to remove his hand from the feed up slot was not a violation of the Eighth Amendment).

### 5.  *The November 5, 2010 Incident*

According to Plaintiff, Corrections Officers Ramsdell, Eddy, and Arquitt came to his cell to escort him to a disciplinary hearing, and when they pulled him from his cell and he complained that the handcuffs were affixed too tightly, "Defendant Ramsdell grabbed the back of Plaintiff's head and slammed his face against the wall."  Am. Compl. at ¶ 35. Plaintiff cites as authority for his claim the Use of Force Report prepared by Defendants. *Id.* That Use of Force Report states as follows:

> I, Officer Ramsdell, T [sic.] used force on this inmate as he turned towards me in a threatening manner while being pat-frisked before going to a tier hearing. I used my right hand and placed it on the back of the inmates head in an attempt to stop the inmate from turning. The inmate resisted. The area supervisor then directed me to place him back into the cell. When attempting to remove the mechanical restrainst [sic.]. The inmate grabbed me by the right hand with his right hand and refused to let go. I then pulled my hand free from his grip and use both my hands to control the retention strap until the mechanical restraints were removed. No further force was used.

Dkt. No. 485-19, Kerwin Aff., Exhibit E, Bates No. 481.

The incident was videotaped, and that Video has been provided to the Court for its

-29-

review. The Video discloses that on November 8, 2010 at 11:55:06 a.m., three Officers approached Plaintiff's cell. Approximately fifty seconds later, two of those Officers began the process of handcuffing Plaintiff through the FPHC. At 11:56:11, Plaintiff was brought out of the cell and walked directly towards the wall. He appears to turn, and is redirected back towards the wall by one of the Officers and pushed up against it. That event occurs at 11:56:20. Neither his head nor his face is slammed against the wall at any time. At 11:56:25, Plaintiff is returned to his cell, after having been in the hallway for fifteen seconds. After Plaintiff is in his cell, the Officers appear to struggle removing the handcuffs from Plaintiff, utilizing a retention strap. They were ultimately successful in that endeavor at 11:58:11. Thus, the entire event took a total of less than three minutes.

A reasonable jury could not conclude that the use of force as depicted in the November 8, 2010 Video constituted an unnecessary and wanton infliction of pain, such that the limitations imposed by the Cruel and Unusual Punishment Clause of the Eighth Amendment were violated. Had Plaintiff's allegations of a gratuitous slam of his face against the tier wall been borne out, an Eighth Amendment violation could certainly be found. However, the Video of the incident clearly contradicts Plaintiff's claims in this regard. What is depicted—the use of minimal force by the Corrections Officers to control Plaintiff by applying handholds and pressure against the wall, without any punching, striking or hitting, and limited to a period of approximately fifteen seconds—cannot be said to be a constitutional violation. *White v. Williams*, 2016 WL 4006461 (N.D.N.Y. June 22, 2016) (finding no constitutional violation where video shows officer redirecting an agitated inmate

-30-

towards the tier wall, his chest contacts the wall where he is held for a period of thirty seconds, and where inmate is neither struck nor beaten), *report and recommendation adopted*, 2016 WL 4005849 (N.D.N.Y. July 25, 2016).  It is recommended that Defendants' Motion for Summary Judgment as to this claim be granted.

### 6.  The April 23, 2011 Incidents

According to Plaintiff, the alleged unconstitutional incidents on April 23, 2011 started with a claim that Corrections Officers Wood and Derouchie provided an unwrapped kosher loaf to Plaintiff for lunch.  Am. Compl. at ¶ 36; Barnes Reply Decl. at ¶ 17(a).  Plaintiff alleges they tampered with his meal by possibly spraying a substance on it to induce vomiting, and, additionally, that in the process of providing lunch, they repeatedly slammed Plaintiff's arm and hand into the feed up slot.  *Id.*  Plaintiff was subsequently transported to the infirmary by Officers Yaddow, Riley and Bond.  *Id.*  Plaintiff maintains that he was placed in cell # 2 at the infirmary and assaulted by Defendants Yaddow, Riley, and Grant, and that Defendant Bond looked on and failed to intervene.  *Id.*; Barnes Reply Decl. at ¶¶ 17(b) & (c).  The assault allegedly involved slamming Plaintiff to the ground while he was handcuffed, and then stomping, kicking, and punching him.  Barnes Reply Decl. at ¶ 17(b).

Plaintiff then claims what while he was being examined by Nurse Maas, Defendant Derouchie arrived to escort him back to his cell, and Plaintiff begged not to have Derouchie be the Escort Officer.  *Id.* at ¶ 17(e).  In response, Plaintiff alleges that Defendant Derouchie punched him in the face with a closed fist, and that Derouchie, with the assistance of Defendants Bowman and Santamore, slammed Plaintiff to the ground and unleashed a

barrage of kicks, stomps, punches and blows, which were all witnessed by Defendants Zerniak and Salls, who allegedly failed to intervene. *Id.* at ¶¶ 17(e) & (f).

Defendants' position is that, at Plaintiff's request, Plaintiff was taken to the infirmary and was escorted there by Defendants Bond, Riley, and Sgt. Yaddow. Defs.' SMF at ¶ 187. The escort was said to be routine and no assaultive behavior occurred. *Id.* at ¶ 188. However, when Plaintiff reported to the staff that he had been assaulted by Officers Yaddow, Riley, Bond and Grant in room #2 of the infirmary, Lt. Salls was tasked to investigate the claim. *Id.* at ¶¶ 188-90. Lt. Salls observed no injuries, nor did the nurse who examined Plaintiff. *Id.* at ¶¶ 194 & 197. Lt. Salls concluded that there was no merit to Plaintiff's allegations. *Id.* at ¶ 202.

Plaintiff then refused to attend the sick call and requested to be taken back to his cell. *Id.* at ¶ 195. Officer Derouchie was called to transport Plaintiff back to his cell. *Id.* at ¶¶ 207- 08. Plaintiff objected, and when Defendant Derouchie approached him to apply restraints, Plaintiff is said to have struck Derouchie with a closed fist to the left side of the Officer's face. *Id*. at ¶ 212. Officer Bowman then came to the aid of Officer Derouchie, and using body holds, forced Plaintiff to the ground. *Id.* at ¶ 213. Sgt. Santamore then applied the restraints. *Id.* at ¶ 213. Officer Bond maintains that he did not observe any excessive force being used, and Officer Grant notes that he left the area prior to this event, having been relieved by Officer Van Ess. *Id.* at ¶¶ 215-16.

As to the initial incident involving the delivery of food by Defendants Wood and Derouchie and the claim that these Officers slammed Plaintiff's hand into the feed up tray,

the Court notes that the Declarations submitted by Defendants Wood and Derouchie simply do not address this particular incident. *See* Dkt. No. 486-6, Derouchie Decl.; Dkt. No. 486-23, Wood Decl.    Accordingly, summary judgment on this issue is not properly supported by the present record.  As to the remaining claims of excessive use of force, these allegations present quintessential factual issues for the jury to decide. The allegations contained in Plaintiff's Declaration of intentional stomping, beating, and kicking, while Plaintiff was restrained, are sufficient to allow this matter to proceed.  Also sufficient to create an issue of fact is Plaintiff's claim about the alleged failure to intervene.  Finally, and as previously noted, these same factual issues prevent a finding of qualified immunity, at least at this time.

### 7.  *May 19, 2011 and May 25, 2011 Incidents*

Both the May 19th and May 25th, 2011 incidents involve a similar fact pattern: Plaintiff is taken out of his cell for purposes of a cell search and is held in a lower holding cell while that search is proceeding.  Am. Compl. at ¶¶ 43 & 49.  Plaintiff claims that during the course of that detention, he is assaulted when the Corrections Officers, manipulating his handcuffs, "took turns in rotation for approximately 40 minutes digging large hideous holes in the Plaintiff's wrist causing him to beg and plead . . ." *Id.*  Plaintiff alleges that the May 19th assault was inflicted by Defendants Arquitt, J. Clark, B. Clark, Mailloux and John Doe; under the direction of Defendant L. Gokey; and that it was witnessed by Officers Vanornum, Albert, Johnson, Norcross, Wood, Bond, Tuper, Zerniak, and Salls, who allegedly failed to intervene. *Id.* at ¶ 43. As for the May 25th, 2011 incident, Plaintiff alleges that this assault

was perpetrated by Defendants Clark, Bogett, Manley, and Mainville; supervised by Defendants L. Gokey and Zerniak; and witnessed by Defendants Sisto, Vanornum, Salls, Keating, Richards, Bond, Tuper, Barney, Brand, Mailloux, and Derouchie, who again failed to intervene. *Id.* at ¶ 49.

Defendants' version of events is, as one can imagine, dramatically different. Defendants note that on May 19th, 2011, Plaintiff engaged in misconduct by flooding his cell. Defs.' SMF at ¶ 220. This caused prison authorities to not only cut off Plaintiff's water, but also to conduct a cell search to locate the source of the flooding and possibly remove any item or contraband associated with the flooding. *Id.* at ¶ 224. During the course of these events, it is alleged that Plaintiff also threatened staff. *Id.* at ¶¶ 226 & 228. Defendant L. Gokey issued the order authorizing the search of Plaintiff's cell. *Id.* at ¶ 232. The extraction team was assembled, and that team, along with Capt. Zerniak, approached Plaintiff's cell, at which point in time Plaintiff voluntarily agreed to exit his cell. *Id.* at ¶¶ 238-239, 243.

Plaintiff was then escorted by the extraction team to a lower holding pen to be held while staff conducted the search of the cell. *Id.* at ¶ 240. Defendants assert that they followed standard practice with an inmate who has shown violent propensities, by having Corrections Officers, who are already in riot gear, maintain physical control of the inmate while he was in the holding cell by placing him in the corner and keeping his mechanical restraints on him. *Id.* at ¶¶ 244-46. Defendants deny purposely injuring Plaintiff while he was in the holding cell, and note that "when an inmate like inmate Barnes resists staff, (i.e., pulls, tugs, or struggles against his cuffs) he may self-inflict some wounds." *Id*. at ¶ 247.

Defendants also alleged that Plaintiff did not sustain any serious injury as a result of this event. Finally, Defendants assert that Defendants Johnson, Arquitt, Albert, Tuper, B. Clark, Malloux, Vanornum, and Norcross were not personally involved in the May 19th, 2011, escort and incident. Defs.' SMF at ¶ 250.

With regard to the May 25th, 2011, incident, Defendants claim that Plaintiff engaged in suspicious activity (failing to return his Styrofoam tray) which again resulted in Defendant L. Gokey authorizing a cell search. *Id.* at ¶¶ 257 & 259. Prison staff, together with four extraction officers, Mainville, Boyd, Manley, and B. Clark, approached Plaintiff's cell and, as a result of this show of force, Plaintiff voluntarily exited his cell. *Id.* at ¶¶ 261-62. The Officials escorted Plaintiff to the holding pen and the members of the extraction team held Plaintiff in the corner of the pen, maintaining control of him at all times. *Id.* at ¶¶ 263, 266-67. Defendants claim that while in the holding pen, Plaintiff became aggressive and struggled with the Officers. *Id.* at ¶¶ 268-71. After the cell search was completed, Plaintiff was escorted back to his cell, where he once again struggled during the process of attempting to remove his handcuffs. *Id.* at ¶¶ 272-73. He was thereafter assessed by medical staff and found to have minor injuries. *Id.* at ¶ 275. Again, Defendants note that "[i]nmates, like Inmate Barnes, often self-inflict wounds in their hands or wrists by pulling on or twisting their handcuffs." *Id.* at ¶ 280 (citing Dkt. No. 486-14, Declaration of Steven A. Salls, Jr., at ¶ 53). Finally, Defendants assert that Officers VanOrnum, Keating, Bond, Tuper, Barney, Brand, and Mailloux were not present during this incident. *Id.* at ¶ 286.

With regard to medical treatment, according to the records maintained by DOCCS,

-35-

Plaintiff was seen on May 19, 2011, at 12:35 p.m. and at that time he was complaining of bilateral wrist pain; swelling of the left and right wrists, and abrasion on the right elbow were observed. Dkt. No. 488-1 at p. 16, Treatment Note of 5/19/2011. An examination of the wrist the next day found "1-very fine scratch mark." *Id.,* Treatment Note of 5/20/2011. After the second incident on May 25th, 2011, Plaintiff was observed to have "scattered superficial lacerations & cuff marks." *Id.* at p. 12, Treatment Note of 5/25/2011. At that time, Plaintiff was also complaining of left ankle pain and testicular pain. *Id.*

The Videos presented to the Court with the Motion are not determinative of this excessive force issue. First, only the Videos for the May 25th, 2011 incident have been provided; the May 19th Video supplied only depicts Plaintiff flooding his cell; the extraction and activities in the holding cell are not depicted. With regard to the May 25th 2011 incident, Plaintiff is clearly seen being escorted in handcuffs to the holding pen, and then while in the pen, he is placed in the corner and is surrounded by four Officers in riot gear, with two supervisors watching and attempting to communicate with Plaintiff. Because of the placement of the Officers, neither the Video from the fixed mounted camera nor the handheld camera discloses exactly what occurred in that holding cell vis-à-vis Plaintiff. Plaintiff can be heard continuously yelling and screaming, and at points he goes to the ground with the Officers on top of him. While the Videos do not show strikes or stomping, or swinging of the hands, which certainly supports the Defendants' version of events, it does not necessarily rule out the possibility that the extraction Officers were manipulating or twisting the handcuffs to inflict pain and discomfort upon Plaintiff.

-36-

The parties therefore offer materially different accounts of the incident which effectively precludes the entry of summary judgment. Specifically, the parties' contentions create a disputed issue of material fact at the subjective prong of the Eighth Amendment claim as to whether Defendants applied force to Plaintiff "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 7. The Court cannot appropriately resolve these credibility issues on a motion for summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. at 9. However, where a prisoner's allegations and evidentiary proffers, if credited, could reasonably "allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment dismissing an excessive use of force claim is inappropriate. *Wright v. Goord*, 554 F.3d at 269 (*citing Scott v. Coughlin*, 344 F.3d at 291).

Defendants next argue that even if the Court accepts Plaintiff's allegations at true, his medical records establish that he suffered, at most, minor and temporary injuries and therefore any force applied was necessarily *de minimis*. Defs.' Mem. of Law at pp. 13-14. Defendants' contention fails because while "[t]he extent of injury may [ ] provide some indication of the amount of force applied . . . it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010). "The absence of serious injury is therefore relevant to

the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Plaintiff alleges more than a *de minimis* application of force, and his sworn allegations regarding malicious infliction of pain and injury are sufficient to create questions of fact on this issue. Questions of fact also exist regarding the exact participants in the incidents, and whether certain Defendants had the obligation, and the ability, to intervene. Finally, questions of fact exist regarding the qualified immunity defense.[12]

### 8. *August 23, 2011 Incident*

Plaintiff alleges that on August 23, 2011, after being threatened by Defendant Wood, Defendants B. Clark and Tulip approached his cell and escorted him to the infirmary where he was to undergo an X-ray. Am. Compl. at ¶ 52; Barnes Reply Decl. at ¶ 22. According to Plaintiff, while in the infirmary, he was allegedly stomped, kicked, and punched by Defendants B. Clark, Tulip, and Hungerford, without reason or justification. Barnes Reply Decl. at ¶ 22. Officer Tulip allegedly struck Plaintiff in the face with a closed fist, and then, while lying on the floor with handcuffs attached, Plaintiff was said to be beaten again by Defendants Hungerford, B. Clark, Tulip, Currier and a "Doe" Officer. *Id.* Plaintiff also alleges that Defendants Rendle, Gettman, and Arquitt threatened him and stepped on his head and jaw as he lay on the floor, and also kicked and fractured his leg. *Id.* Plaintiff also alleges

---

[12] Defendant Antcil is named only as a Defendant with respect to the May 19th incident. Am. Compl. at ¶ 125. Plaintiff does not allege that Antcil was involved in or present for the alleged use of force, but that he "engaged in obstruction of justice" by failing to preserve evidence regarding the incident. *Id; see also id.* at ¶ 43 (discussing those involved in incident, but not naming Antcil). "The law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citing cases). Plaintiff's claim regarding the alleged failure to preserve evidence should be dismissed. *McCloud v. Prack*, 55 F. Supp. 3d 478, 481 (W.D.N.Y. 2014).

that Defendants Currier, Perham, and Arquitt failed to intervene and stop the beating.  *Id*.

Next, Plaintiff states that he was picked up off the floor and thereafter a plastic bag was placed over his head and he was choked, which caused him to black out; when he came to, he was being assaulted again by Defendant Gettman, with Defendants Bishop, Hungerford, Currier, and Perham watching.  *Id*.  Plaintiff was then escorted back to his cell—10-C1-08.  *See* Video of 8/23/2011.  Photographs were taken from a distance, but according to Plaintiff, no photos were taken of his bleeding, and possibly broken, left baby toe, despite a promise by Defendant Uhler to do so.  Am. Compl. at ¶ 55.  Plaintiff asserts that his right fibula bone was fractured as a result of Defendant Arquitt repeatedly striking Plaintiff's right leg with a baton.  Barnes Reply Decl. at ¶ 22.

Defendants agree that Defendants B. Clark and Tulip escorted Barnes to the infirmary for purposes of obtaining an X-ray.  Defs.' SMF at ¶ 290.  However, they allege that once Defendant B. Clark removed Plaintiff's handcuffs, Plaintiff responded by striking Officer B. Clark with his fist.  *Id*. at ¶ 291.  Officer Tulip then attempted to take Plaintiff to the ground using a body hold, at which point Plaintiff bit Defendant Tulip's upper arm, breaking the skin and ultimately requiring four sutures to close.  *Id*. at 292; Dkt. No. 485-23, Bates No. 933. In response, Defendant Tulip attempted to stop the assault by punching Plaintiff in the jaw and the neck.  Defs.' SMF at ¶¶ 292-93.  Ultimately, Plaintiff Barnes was restrained.  *Id*. at 295.  Lieutenants Rendle and Bishop, as well as Sgt. Gettman, deny using any force upon Plaintiff in connection with this incident.  *Id*. at ¶¶ 297-99.  Officer Perham maintains that he was involved only in the transport of Plaintiff back to his cell, and arrived after any use

of force. *Id.* at ¶ 300. Nurse Lashway denies being present for any use of force by Corrections Officers, and states that her involvement was limited to treating the bite wounds sustained by Defendant Tulip.[13] *Id.* at ¶¶ 302-04.

Upon review of the evidence presented on this Motion and Cross-Motion, the Court concludes that the incident of August 23, 2011, involves questions of fact that require resolution at trial. The fact that certain portions of the event appear uncontroverted, for example, that Plaintiff bit Defendant Tulip in the arm causing a significant bite wound, or that Plaintiff apparently sustained a leg fracture during the course of the struggle, do not definitively answer the question of whether there was a violation of Plaintiff's constitutional rights. Further, whether a particular Defendant participated in the alleged assault, or failed to intervene, when such activity is disputed, and the Defendant denies the allegation, is also a dispute that must be resolved by the trier of fact.

### 9. The September 9, 2011 Incident

On September 9, 2011, Plaintiff was to be transported to an outside medical appointment. Am. Compl. at ¶ 59. Several Corrections Officers arrived at his cell for the transport. *Id.* Plaintiff was handcuffed while within the cell, and then he was brought out of the cell and placed against the wall to be searched. *Id.* at ¶ 60; Fixed Video of the Sept. 9, 2011 Incident. According to Plaintiff, Corrections Officers Ramsdell, B. Clark, Dunning, and Paige were present at the time were. *Id.* Plaintiff then objected to proceeding on the

---

[13] As to Defendant Lashway, Plaintiff himself notes that he was referring to a "Jane Doe" and not to P.A. Lashway in his Amended Complaint. Barnes Reply Decl. at ¶ 22.KK ("Jane Doe, Correction Officer (not Amber Lashway, a Physician Assistant.)"). Therefore, it is recommended that Lashway be dismissed as a Defendant.

medical visit and asked to be returned to his cell, and claims that the basis for this was that he saw that Defendant Dunning had a camcorder, which made Plaintiff feel "chillingly eerie." *Id.* Plaintiff was put back in his cell. *Id.* At this point, a retention strap had been attached to the handcuffs that were affixed on Plaintiff. *Id.* According to Plaintiff, when he was put back in the cell, Defendant Ramsdell struck him with a closed fist. *Id.* At the same time, Plaintiff alleges that Defendant B. Clark began to pull on the retention strap, and was then joined by Defendant Ramsdell, resulting in Plaintiff's hands being pulled into the Fixed Protective Hatch Cover. *Id.* Plaintiff asserts that his finger was caught between the plexiglass lid of the FPHC, and its metal body, and that when Defendant Dunning came up to the hatch cover and began repeatedly striking the plexiglass—this caused Plaintiff's left ring finger to be amputated at the tip. *Id.*; *see also*, Dkt. No. 435-2, Barnes Decl. at ¶ 4. Plaintiff further alleges that while Defendant Dunning was pounding on the top of the FPHC, Defendants Allen, Ramsdell, B. Clark, and Paige failed to intervene. Am. Compl. at ¶ 60.

While Defendants agree with certain basic facts of this September 9, 2011, incident, they dispute that the force employed was in any way inappropriate. They note that when Plaintiff refused to continue on the trip to medical, he was immediately returned to his cell. Defs.' SMF at ¶ 305. Defendant Ramsdell denies ever punching Plaintiff or using excessive force. Dkt. No. 487-27, Declaration of Timothy Ramsdell ("Ramsdell Decl."), ¶¶ 15-18; *see also* Dkt. No. 487-10, Declaration of Bryan Clark ("B. Clark Decl."), ¶ 39.

Defendants allege that upon Plaintiff's return to the cell, a struggle ensued when Defendants were attempting to remove the mechanical restraints on Plaintiff. B. Clark Decl.

at ¶ 36; Ramsdell Decl. at ¶ 15.  At this point, Defendants allege that Plaintiff grabbed Officer B. Clark's right wrist, as well as the keys to the handcuffs, and attempted to pull them into the cell.  *Id*.  Defendant Ramsdell was able to secure the cuff keys, and Defendant B. Clark was able to free his hand.  *Id.*  Defendants attempted to close the cover of the FPHC, but Plaintiff allegedly attempted to push the cover open with both of his hands, trying to grab Officer B. Clark.  *Id.*  When the Hatch cover was then forced closed by Defendant Dunning, Plaintiff's fingertip was severed  *Id.*

The Video provided to the Court is from the fixed hallway camera.  *See* Sept. 9, 2011 Video.  The Video shows that at 6:26:56 am, three Officers are at Plaintiff's cell door and advise him of the trip.  At 6:31:18, a Corrections Officer arrives with a wheel chair, the cell door is cracked open, and Plaintiff walks out of his cell.  At 6:31:44 Plaintiff is outside of his cell, against the wall, undergoing a pat-down search.  At this time, there are five Corrections Officers around Plaintiff, including one Corrections Officer behind a rolling mail cart.  At 6:34:28 Plaintiff indicates that he wants to go back to his cell, and at 6:35:16 he is returned to the cell, and the cell door is closed at 6:35:28.  At 6:35:42 Officers are around the FPHC, and at 6:35:48 it appears that the Officers are struggling with Plaintiff.  At 6:36:03, two slams on the FPHC can be heard.  At 6:36:12 there is an indication from one of the Officers that the door is "red."  At 6:36:22 the Officers step back from the FPHC, and at 6:36:25 there is a call that "they're going to need a nurse."  Accordingly, the elapsed time between the beginning of the struggle and the call for the nurse was thirty seconds.  The remaining parts of the Video show the nurse coming to the floor, and Plaintiff being taken away in a wheel chair.

Once again, the Video evidence submitted by Defendants is not determinative of the issue at hand. Certainly, if Defendants' version of events is believed, to wit: that Plaintiff attempted to seize both the wrist and handcuff keys from a Corrections Officer, and that the involved Officers responded by struggling with Plaintiff and forcing the Hatch cover closed which then, unintentionally, amputated the tip of Plaintiff's finger, then there would be no Eighth Amendment violation. On the other hand, if Plaintiff's claims that the Corrections Officers were purposely pulling his hands through the FPHC for no apparent reason, and in conjunction with this, Corrections Officer Dunning maliciously closed the cover of the Hatch on Plaintiff's finger with such repeated force as to inflict a severe injury, were accepted, the jury could rightfully find that there has been a constitutional violation. The Court is not in a position, based upon this record, to determine that there are no questions of fact on this issue. Questions of fact also remain with regard to the ability of the surrounding Corrections Officers to intervene, in the event that the jury finds that there was a ongoing constitutional violation. For those reasons, Defendants' Motion for Summary Judgment on the September 9, 2011 incident should be denied. Summary judgment on the basis of qualified immunity should also be denied at this time.

### D. Plaintiff's First Amendment Retaliation Claims

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially

-43-

motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493) (internal quotation marks omitted). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing "that the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence that would allow an inference that a defendant acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required, and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.

-44-

1994)).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

Plaintiff has identified the following conduct which he alleges is protected under the First Amendment, and the following corresponding alleged retaliatory acts:

| Date | Grievance/Complaint | Defendant(s) | Retaliatory Conduct |
|------|---------------------|--------------|---------------------|
| 4/24/2011 | UST-45959-11 (Am. Compl. at ¶¶ 88, 90, 92, 95) | Zerniak, Salls, Wood, and Derouchie | Zerniak filed a false report and failed to properly document the use of force that occurred on 5/9/2011; Salls made a retaliatory statement; Defendants "staged" the uses of force on 5/19 and 5/25/2011. |

-45-

| 5/1/2011 | UST-46027-11 (Am. Compl. at ¶¶ 89, 93, 95) | L. Gokey, Derouchie, and Wood | L. Gokey filed a false report and failed to document use of force on 5/19/2011; and "staged" uses of force on 5/19 and 5/25/2011 |
|---|---|---|---|
| 5/19/2011 | UST-46222-11 (Am. Compl. at ¶¶ 91, 94) | Zerniak and L. Gokey | Zerniak and L. Gokey staged the 5/25/2011 incident |
| 8/22/2011 | UST-46965-11 (Am. Compl. at ¶¶ 96, 98) UST-46222-11 (Am. Compl. at ¶ 97) | Gettman | Stomps and kicks Plaintiff on 8/23/2011 and states: ". . . You want to file a grievance on me I will give you a reason you piece of shit." |
|  | UST-47088-11 UST-47090-11 (Am. Compl. at ¶ 99) | Ramsdell and B. Clark | Use of force on 9/9/2011, with B. Clark pulling on retention strap without justification and Ramsdell striking Plaintiff in the face with a closed fist |

| 2/12/2013 | *Barnes v. Fischer*, 13-CV-164 (N.D.N.Y. 2013) (Am. Compl. at ¶¶ 100-102) | Sisto, Labarge, and Scott | On 12/6/2013 Sisto stated "Nigger I will give you a reason to sue me bitch." Sisto then slammed Plaintiff's right hand in tray slot. Labarge and Scott failed to photograph injury. |
| 9/20/2011 9/27/2011 | UST-47267-11 UST-47340-11 (Am. Compl. at ¶¶ 103, 105-06) | Uhler | Excluded Plaintiff from three hearings and told him he would die in his cell; did not properly pack Plaintiff's property when he was on outside trips; and on 9/15/2013 Plaintiff was infected with herpes or another disease. |
| 10/3/2011 | UST-47377-11 (Am. Compl. at ¶ 104) | Uhler | Excluded Plaintiff from hearing. |

There is very little question that the filing of a grievance or a lawsuit constitutes activity protected under the First Amendment to the United States Constitution. *Colon v. Coughlin*, 58 F.3d at 872 (holding that prison officials are prohibited from retaliating against prisoners for exercising their right to petition for redress of grievances). With regard to adverse action it is also clear that the physical assaults that Plaintiff has referenced in his Complaint as to which this Court has already found questions of fact under a more rigid

-47-

Eighth Amendment standard, (the incidents of May 19th, May 25th, August 23rd and September 9th), are sufficient to support a First Amendment retaliation claim. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Finally, the close temporal proximity between the protected activity and the alleged assaults, by itself, creates an inference of a causal connection sufficient to overcome the present motion for summary judgment. *Id.* at 129-30. As a result, summary judgment should be denied as to all claims alleging retaliatory use of force for the May 19th, May 25th, August 23rd, and September 9th incidents.

The allegations against Sisto, Labarge, and Scott raise a claim similar to those just discussed—that excessive force was used to retaliate against the exercise of protected activity, in this circumstance the filing of claims in this litigation. Am. Compl. at ¶¶ 100-102. Sisto's Declaration in Support of Summary Judgment does not mention this incident. Dkt. No. 486-15. The allegation of excessive force against Sisto within months of the filing of this lawsuit is sufficient on this record to raise questions of fact and it is recommended that summary judgment be denied as to this claim. *Espinal v. Goord*, 558 F.3d at 129. It is therefore recommended that this claim be permitted to proceed.

As to Labarge and Scott, however, the Court recommends granting Defendants' Motion for Summary Judgment. "To satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Vega v. Artus*, 610 F. Supp. 2d 185, 207 (N.D.N.Y. 2009) (internal quotations and citations omitted). This incident was allegedly retaliation for filing this lawsuit, but Labarge and Scott were not added to the

case as defendants until after leave to amend was granted in September 2014, more than nine

months *after* the incident alleged here occurred on December 6, 2013. See Dkt. No. 185.

While Plaintiff's lawsuit was filed prior to this incident, there is no allegation that either

Labarge or Scott knew of it before being named as defendants over a year and a half later and

so there is no basis for finding a casual connection between it and their alleged actions.

*Michaels v. Attorney Gen., Dep't of Justice*, 544 F. Supp. 2d 131, 139 (D. Conn. 2008).

Plaintiff next claims that Defendant Uhler retaliated against him by expelling him

from four different disciplinary hearings presided over by Uhler. Plaintiff alleges that these

exclusions were without a legitimate basis and in response to grievances filed by Plaintiff

within days of the hearings. Am. Compl. at ¶¶ 103-104. Inmates have a limited right under

New York law to be present at a disciplinary hearing. N.Y. Comp. Codes R. & Regs. tit. 7,

§ 254.6 ("The inmate shall be present at the hearing unless he or she refuses to attend, or is

excluded for reasons of institutional safety or correctional goals."). Due process also

requires that inmates be afforded the opportunity to present a defense at such a hearing.

*Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999). Defendant Uhler does not recall

all of these hearings. Dkt. No. 485-27, Declaration of Donald Uhler ("Uhler Decl."), ¶¶ 57-

58. While stating that he never excluded Plaintiff from a hearing to retaliate against him,

Uhler also admits to not having a "specific recollection" of at least two of the hearings at

issue. *Id.* This is insufficient to overcome Plaintiff's allegations to the contrary. Given the

close temporal proximity between the grievances and the alleged exclusions and the

important interest an inmate would have in being present for a disciplinary hearing, the Court

recommends that Uhler's motion with respect to the alleged retaliation be denied.

Finally, Plaintiff claims Uhler, along with Zerniak and Eddy and others, retaliated by ordering that his property not be packed up when he was out of Upstate on medical or legal trips and that as a result legal papers were destroyed or otherwise tampered with and that as a result Plaintiff was infected with "herpes or some hideous disease through a pack of peanut butter." Am. Compl., at ¶¶ 105-106. These claims generally allege that Uhler permitted unfettered access to Plaintiff's cell and that correctional staff freely went in and out of the cell. It does not specify when or for how long this occurred, exactly what papers were allegedly tampered with, and is non-specific as to the allegations about contracting a disease as a result. Uhler specifically denies a role in ordering that Plaintiff's cell not be packed for trips. Uhler Decl. at ¶¶ 48-52. It is clearly established that "claims of retaliation must be supported by specific facts; conclusory statements are not sufficient." *Jean-Laurent v. Lane*, 2016 WL 4775742, at *12 (N.D.N.Y. Aug. 18, 2016), *report and recommendation adopted*, 2016 WL 4768828 (N.D.N.Y. Sept. 13, 2016) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). The retaliation claims asserted in paragraph 105 of the Amended Complaint are too undefined and conclusory to withstand summary judgment and it is recommended that they be dismissed.[14]

---

[14] In Paragraph 62 of the Amended Complaint, Plaintiff makes similar allegations that security staff has subjected him to differentiated treatment from other inmates regarding "illegal random, ill-advised cell searches." To the extent Plaintiff seeks to raise claims regarding this conduct, these allegations also fail to state a claim for relief. It is clear that prisoners have no reasonable expectation of privacy in their prison cell and random cell searches are fully permissible. *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984); *DeMaio v. Mann*, 877 F.Supp. 89, 95 (N.D.N.Y.1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."). Moreover, "Plaintiff's vague and conclusory allegations are insufficient to plausibly suggest an equal protection violation." *Beaver v. Dippert*, (continued...)

### E.  Plaintiff's Due Process Claims

In paragraphs 107 through 112 of the Amended Complaint, Plaintiff alleges the denial of due process.  Paragraph 107 of the Amended Complaint concerns the alleged failure to preserve video evidence.  Plaintiff sought to raise this allegation in his February 2014 Motion to Amend.  Dkt. No. 144.  By Order dated September 22, 2014, Plaintiff's Motion to Amend was granted except with respect to the claim contained in paragraph 107, for which leave to amend was denied on the ground that it would be futile.  Dkt. No. 185 at pp. 6-7.  Therefore, this claim is not a part of this litigation.

Plaintiff's other due process claims relate to a September 23, 2011, disciplinary hearing held by Defendant Uhler, the disposition of which was ultimately affirmed by Defendant Prack.[15]  Plaintiff alleges that Uhler was not impartial during the hearing, predetermined the outcome, and imposed an excessive sentence.  Am. Compl., at ¶¶ 109-111.  Am. Compl., ¶¶ 108-112.  Such allegations, if true, could provide a basis for liability.  *See, e.g., Ruggiero v. Prack*, 168 F. Supp. 3d 495, 513 (W.D.N.Y. 2016) ("An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer who does not prejudge the evidence.") (internal quotation marks and citations omitted).  Defendant Uhler's Declaration

---

[14](...continued)
2017 WL 3917037, at *4 (N.D.N.Y. Sept. 6, 2017); see also *Thomas v. Pingotti,* 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause.").

[15] The Amended Complaint does not identify the date of the hearing, but alleges that it concerned an August 23, 2011 misbehavior report and resulted in the imposition of a 60 month SHU sentence. Am. Compl., at ¶¶ 109 & 111. A review of Plaintiff's disciplinary record demonstrates that the hearing in question was held on September 23, 2011. Uhler Decl., Ex. E.

indicates that he does not recall the September 23rd hearing.  Uhler Decl. at ¶ 58.  Given the state of the record, summary judgment on this claim would be inappropriate.

Plaintiff also alleges that Prack "acted with deliberate indifference" by failing to remedy Uhler's misconduct when Plaintiff appealed the determination.  Am. Compl., at ¶ 112.  "Courts in the Second Circuit are split over whether an allegation that a defendant affirmed a disciplinary proceeding determination is sufficient to establish personal liability for supervisory officials."  *Jean-Laurent v. Lane*, 2016 WL 4775742, at *28.  "The distinction between those cases that hold that affirmance of a disciplinary hearing is enough and those that hold it is not appears to be that while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results."  *Brown v. Brun*, 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (internal quotation marks omitted) (citations omitted).  In cases such as this "where the only allegation against a defendant is that he affirmed a disciplinary hearing determination on appeal (as opposed to participating in a proactive review of the administrative process), such an allegation is insufficient to state personal involvement by that defendant."  *Long v. Crowley*, 2010 WL 5129102, at *1 (W.D.N.Y. Dec. 10, 2010); *see also Scott v. Frederick*, 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8, 2015) ("Plaintiff fails to allege a single fact from which it could plausibly be inferred that Defendant Prack did anything other than rubber-stamp his disciplinary determination").  Accordingly, it is recommended that Defendant Prack be dismissed based on lack of personal involvement.

## F.  Plaintiff's Supervisory Liability Claims

Plaintiff asserts supervisory liability claims against Defendants Fischer, Bellnier, Rock, and Uhler.  In order to proceed on these claims, Plaintiff must demonstrate that each Defendant was personally involved in an alleged constitutional deprivation.

### 1.  Supervisory Liability, Generally

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  A supervisory official "may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d at 874 & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted).  "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he or she holds a high position of authority).

The Second Circuit has held that the personal involvement of a supervisory official may be established if:

-53-

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d at 873 (citations omitted).[16]

## 2. *Defendant Fischer*

At the times relevant to the Amended Complaint, Defendant Fischer was Commissioner of DOCCS, responsible for the overall management of the Department. Dkt. No. 485-26, Declaration of Brian Fischer ("Fischer Decl."), ¶ 5. Plaintiff alleges that Defendant Fischer had knowledge of the alleged violations of his constitutional rights by way of reports filed against and on behalf of Plaintiff, and a number of complaints and appeals that Plaintiff directed to Defendant Fischer's attention. Am. Compl. at ¶¶ 67-71. He alleges that Defendant Fischer allowed a policy under which investigations are not properly conducted, and grossly mismanages subordinates in investigating complaints and appeals.

---

[16] The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role. *See, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

*Id.* at ¶ 63; Barnes Decl., ¶ 67. He contends that Defendant Fischer was aware of constitutional violations and acquiesced in covering them up, and created a custom or policy under which such violations could occur, and by failing to take remedial actions to deter them from occurring. Am. Compl. at ¶¶ 64-65, 68, & 125. He also alleges that Defendant Fischer failed to properly train or supervise on a number of subjects, including the use of force. *Id.* at ¶¶ 64-65. In particular, he contends that there was no use of force training program. Barnes Decl. at ¶ 72.

As Commissioner of DOCCS, Defendant Fischer received a large number of letters; he therefore did not read and respond to all of them. Fischer Decl. at ¶¶ 6-7. Instead, a secretary in his office would open and read the document and redirect it to a subordinate with responsibility for the subject matter of the correspondence. *Id.* at ¶¶ 8-9. Defendant Fischer has no personal knowledge of any complaints that Plaintiff sent to his office related to this matter, and he was not involved in the grievance process during his time as Commissioner, nor was he aware of the number of grievances filed by Plaintiff during his confinement. *Id.* at ¶¶ 11 & 21. He was not aware of any abuse of Plaintiff while he was confined at Upstate, and he delegated responsibility for supervision and management of Upstate staff to Defendant Rock. *Id.* at ¶¶ 15 & 16. He believed that security staff were properly trained on the proper application of force in compliance with Directive 4944, both at the Training Academy upon recruitment and at least annually when such training was provided, and reasonably believed that the Superintendents at the correctional facilities and their staff were in compliance with the Department's Policy and Directive on the Use of Physical Force as

well as the Policy and Directive on the control of and search for contraband. *Id.* at ¶¶ 17-19.

None of the *Colon v. Coughlin* criteria for personal involvement can be met regarding Defendant Fischer.  First, Plaintiff does not contend that Defendant Fischer personally participated in any violation of Plaintiff's constitutional rights.  Regarding the second *Colon v. Coughlin* factor, Defendant Fischer may have received grievances or complaints from Plaintiff.  It is settled, however, that the mere receipt of, without personal investigation of, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases).  "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d at 199.  Moreover, "it is well settled that the failure of a supervisory official to investigate a letter of protest by an inmate is not sufficient to show personal involvement." *Stone v. White*, 2016 WL 1298725, *12 (N.D.N.Y. Mar. 31, 2016); *Ramrattan v. Fischer*, 2015 WL 3604242, *11 (S.D.N.Y. June 9, 2015) (supervisory defendant's role in the chain of command was insufficient to allege personal involvement, as were allegations that plaintiff had copied the defendant on complaints and grievances).  In fact, "inmates do not enjoy a constitutional right to an investigation of any kind by government officials," and ignoring a complaint does not establish personal involvement. *Banks v. Annucci*, 48 F. Supp. 3d 394, 414-15 (N.D.N.Y 2014); *Withrow v. Goord*, 374 F. Supp. 2d 326, 329 (W.D.N.Y. 2005).  Because Defendant Fischer did not investigate or

respond to Plaintiff's complaints, he cannot be held liable on the second basis under *Colon v. Coughlin*.    Plaintiff's conclusory allegations that Defendant Fischer, who was Commissioner of DOCCS, had knowledge of any constitutional violations or assaults are unsubstantiated. S*ee Voorhees v. Goord*, 2006 WL 1888638, *5 (S.D.N.Y. Feb. 24, 2016) ("[H]igh-level DOCS officials delegate the task of reading and responding to inmate mail to subordinates, and, thus, a letter sent to such an official often does not constitute actual notice.").

Finally, Plaintiff provides no support for the contention that Defendant Fischer created or allowed a custom or policy allowing for constitutional violations.  *Hyman v. Cty. of Albany*, 2016 WL 2865711, *15 (N.D.N.Y. Mar. 31, 2016) (describing that any inference of a custom or policy to condone constitutional violations "would be based on pure speculation").  Defendant Fischer has rebutted Plaintiff's conclusory claims that he failed to properly train or supervise.  Fischer Decl. at ¶ 17. Plaintiff alleges there is no use of force training; however, Defendant Fischer stated that such training is required by all officers.  *Id.* Such conclusory allegations of a failure to train or supervise are insufficient to establish personal involvement.  *See Cox v. Fischer*, 2014 WL 843897, *2 (W.D.N.Y. Feb. 27, 2014) ("[P]laintiff's conclusory assertion, unsupported by any factual allegations, that Commissioner Fischer failed to properly train and supervise his subordinates does not suffice to establish personal involvement."); *Pacheco v. Fischer*, 2011 WL 831524, *2 (N.D.N.Y. Jan. 19, 2011), *report and recommendation adopted*, 2011 WL 830266 (N.D.N.Y. Mar. 3, 2011) ("Plaintiff's conclusory allegations that Defendant Fischer failed to properly train staff

and supervise employees at one of the many facilities in his Department is not enough to establish his personal involvement."). Plaintiff has failed to raise a triable issue as to whether Defendant Fischer may be held liable for supervisory liability, and the Court therefore recommends that Defendants' Motion as to this claim be granted and this claim be dismissed.

### 3. Defendant Bellnier

Defendant Bellnier was employed at facilities other than Upstate until November of 2011, when he became Deputy Commissioner for Correctional Facilities. Dkt. No. 485-38, Declaration of Joseph F. Bellnier ("Bellnier Decl."), ¶¶ 2, 6, & 7. Plaintiff alleges that Defendant Bellnier was made aware of the alleged constitutional violations by misbehavior reports filed by and about Plaintiff, Plaintiff's appeals, and other official records and reports; he contends that Defendant Bellnier exhibited deliberate indifference by failing to protect after being put on notice. Am. Compl. at ¶¶ 70-71. Plaintiff alleges that Defendant Bellnier allowed a policy in which complaints were not properly investigated, and as a result, violations continuously occurred. *Id.* at ¶ 63. He further alleges that Defendant Bellnier acquiesced in coverups of excessive use of force. *Id.* at ¶ 139. Finally, Plaintiff alleges that Defendant Bellnier failed to train or supervise, and that there was no use of force training at all. *Id.* at ¶¶ 64-65; Barnes Decl. at ¶ 72.

Defendant Bellnier became Deputy Commissioner for Correctional Facilities on November 7, 2011. Bellnier Decl. at ¶ 6. In that position, he oversees the overall operational and security management, direction and oversight of the approximately 54 correctional facilities in the Department, and is the highest ranking security official within DOCCS. *Id.*

at ¶¶ 2 & 6.  Defendant Bellnier previously held the position of Superintendent of Marcy Correctional Facility; he was in that position at all times relevant to the Amended Complaint. *Id.* at ¶ 7.  He was not Deputy Commissioner for Correctional Facilities and would not have received any complaint Plaintiff may have submitted to that office prior to November 7, 2011; further, he was not in a position to protect Plaintiff from any pattern of abuse by employees of Upstate.  *Id.* at ¶¶ 8 & 19.  As Superintendent of Marcy, Defendant Bellnier had no responsibility to train or supervise staff of Upstate on the application of use of force, had no authority over staff at Upstate, and was not in a position to receive or act upon Plaintiff's complaints about staff at Upstate.  *Id.* at ¶¶ 9-11.  Prior to November 7, 2011, he was not aware of any records that would indicate that Plaintiff was at an excessive risk of harm by staff at Upstate, and had no authority to transfer Plaintiff out of Upstate.  *Id.* at ¶¶ 12-13.  Defendant Bellnier was not aware of any of the incidents that allegedly occurred on June 15, 2010, July 31, 2010, August 3, 2010, November 5, 2010, April 23, 2011, May 19, 201, May 25, 2011, August 23, 2011, or September 9, 2011.  *Id.* at ¶ 21.

As above, regarding Defendant Fischer, Plaintiff cannot establish personal involvement on behalf of Defendant Bellnier.  Defendant Bellnier was assigned to facilities other than Upstate until November, 2011; until that time, he had no responsibility to handle any of Plaintiff's concerns related to Upstate, and was unaware of Plaintiff's complaints. Bellnier Decl. at ¶¶ 6 & 13.  As such, he was not responsible at the time of any of the incidents Plaintiff alleges in his Amended Complaint.  He also was not responsible for training or supervising staff at Upstate.  *Id.* at ¶¶ 9 & 10.  After Defendant Bellnier became

Deputy Commissioner of Correctional Facilities, he had no involvement with the investigation of Plaintiff's grievances. *Id.* at ¶ 17. Defendant Bellnier's "mere 'linkage in the prison chain of command' is insufficient to implicate" him in these alleged constitutional violations. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citation omitted). Plaintiff's conclusory allegations regarding Defendant Bellnier fail to raise a triable issue as to whether he may be held liable for supervisory liability, and the Court therefore recommends that Defendants' Motion regarding this claim be granted, and this claim be dismissed.

### 4. Defendant Rock

Defendant Rock served as Superintendent of Upstate during the incidents alleged in the Amended Complaint. Dkt. No. 485-33, Declaration of David Rock ("Rock Decl."), ¶ 2. Plaintiff alleges that he sent complaints to Defendant Rock, and that Defendant Rock signed off on all grievance appeals and use of force reports. Am. Compl. at ¶ 23; Barnes Decl. at ¶ 66. Plaintiff alleges that he spoke with Defendant Rock many times, telling him that he was in danger and he needed to be removed from 10-Building, and Defendant Rock failed to allow a transfer. Am. Compl. at ¶¶ 74 & 76. Plaintiff also alleges that Defendant Rock created or allowed to continue a policy that allowed for excessive use of force, and that he had a custom of covering up violations with inaction and failure to discipline. Am. Compl. at ¶¶ 51, 73, 113, & 125.

Defendant Rock, as Superintendent of Upstate, was responsible for the overall supervision and management of the facility. Rock Decl. at ¶ 4. Defendant Rock therefore

delegated significant responsibility to his Deputy Superintendents and their staff. *Id.* at ¶ 7. It was Defendant Rock's responsibility to review all Use of Force Reports, and to determine if such force was in compliance with Department policy, and to refer such reports to the Inspector General's Office when he deemed appropriate. *Id.* at ¶¶ 12-14. He never allowed or encouraged his staff to use unnecessary or excessive force on the inmates confined there, including Plaintiff. *Id.* at ¶ 17. Defendant Rock believes that Plaintiff's complaints were investigated by his subordinate staff or via the Inmate Grievance Program, and to his recollection, none of the investigations revealed any staff misconduct, and none indicated there was a need to move Plaintiff from 10-Building. *Id.* at ¶ 19. He was aware that Plaintiff had complained of staff in 10-Building, however. *Id.* He delegated the responsibility of cell moves to Defendant Uhler, and relied on Defendant Uhler's discretion not to move Plaintiff out of 10-Building; if Defendant Rock had determined a need to move Plaintiff for his safety, however, he would have caused him to be moved. *Id.* at ¶¶ 18, 19, & 22.

Finally, Defendant Rock states that all security staff employed by DOCCS are trained at the Training Academy on all matters of security, including the Use of Physical Force in compliance with DOCCS directive 4944 prior to being assigned a correctional facility assignment. *Id.* at ¶ 9. During their employment, all security staff continue to receive annual training on matters of security, including the Use of Physical Force. *Id.* at ¶ 10. His staff was trained and directed to comply with Directive 4944 any time when physical action was necessary to resolve an incident. *Id.* at ¶ 11.

Plaintiff's claims for supervisory liability against Defendant Rock create material

issues of fact.  Defendant Rock was aware of Plaintiff's complaints, and signed off on some of his grievance determinations.  *See*, *e.g.*, Am. Compl. Exhs., Dkt. No. 186-1, p. 158; Dkt. No. 186-3, p. 8.

A supervisor's review and denial of a grievance, in certain circumstances, is sufficient to establish personal involvement.  *See Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (collecting cases).  Certain courts in this circuit, including this Court, have held that a supervisor's denial of a grievance will only establish personal involvement where there is an ongoing constitutional violation.  *See id.* ("[M]any courts in this Circuit [ ] have held that an alleged constitutional violation complained of in a grievance must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.'") (quoting *Vega v. Artus*, 610 F. Supp. 2d at 198); *see also Sanchez v. Graham*, 2016 WL 5854551, at *7 (N.D.N.Y. Sept. 12, 2016).  As such, "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."  *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *Ford v. Martuscello*, 2017 WL 4181385, at *8 (N.D.N.Y. July 20, 2017), *report and recommendation adopted*, 2017 WL 4155358 (N.D.N.Y. Sept. 18, 2017); *Thompson v. New York*, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001).

Here, Plaintiff's grievances repeatedly contained complaints regarding the same individuals.  Therefore, it may be found that an alleged violation was ongoing, and that Defendant Rock's failure to remedy the ongoing violation could provide his personal

involvement in the violations. *See Gantt v. Lape*, 2011 WL 673783, *3 (N.D.N.Y. Jan. 18, 2011), *report and recommendation adopted*, 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011) ("[L]iability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member."). The Court therefore recommends that Plaintiff's supervisory liability claims against Defendant Rock be permitted to proceed, and that Defendants' Motion on this point be denied.

### 5. *Defendant Uhler*

Defendant Uhler was Deputy Superintendent for Security at Upstate at the times of the incidents alleged in the Amended Complaint. Uhler Decl. at ¶ 2. Plaintiff alleges that he spoke with Defendant Uhler many times about the danger he felt in 10-Building and his desire to be transferred; he specifically alleges he told Defendant Uhler about the August 23, 2011 incidents in person, immediately after they occurred. Am. Compl. at ¶ 55, 76; Uhler Decl. at ¶ 40. Plaintiff alleges that Defendant Uhler did not properly investigate Plaintiff's complaints, and that he acquiesced in a coverup of use of force. Am. Compl. at ¶¶ 108-12, 125. Plaintiff alleges that Defendant Uhler instructed Defendants to treat Plaintiff poorly, and that he has a custom of failing to discipline, even when confronted with use of force reports and logs and prisoner complaints. *Id.* at ¶¶ 62, 73, & 113.

Defendant Uhler was Deputy Superintendent for Security from October 7, 2009 to May of 2014, and was Captain at Upstate and Clinton prior to that. Uhler Decl. at ¶ 2. As Deputy Superintendent for Security at Upstate, Defendant Uhler was charged with the overall security of the facility, and reported directly to Defendant Rock. *Id.* at ¶ 5. He was

responsible for reviewing and investigating complaints of staff misconduct alleged by Plaintiff, and cannot recall any investigations revealing any evidence of staff misconduct. *Id.* at ¶ 10. He was not aware of any misconduct by staff in 10-Building against Plaintiff, and never encouraged his staff to use excessive force on Plaintiff or any other inmate, or to cover up the use of unjustified force. *Id.* at ¶¶ 10, 12. Defendant Uhler personally reviewed most of the Use Of Force reports relevant to the incidents alleged in the Amended Complaint, and found that the uses of force were necessary. *Id.* at ¶¶ 16-17. Defendant Uhler never felt that Plaintiff was at risk of serious danger or injury by being housed in 10-Building, or the need to move Plaintiff from 10-Building for his safety. *Id.* at ¶¶ 13, 53.

As described above, a supervisor is not personally involved in a constitutional violation simply because he or she was responsible for reviewing a prisoner's grievances. Rather, the supervisor must be confronted with an ongoing violation, where he or she has the ability to remedy the wrong. *Burton v. Lynch*, 664 F. Supp. 2d at 362; *Hartnett v. Barr*, 538 F. Supp. 2d 511, 524-25 (N.D.N.Y. 2008). "[L]iability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member." *Gantt v. Lape*, 2011 WL 673783, at *3. Defendant Uhler was responsible for reviewing and investigating allegations of staff misconduct by Plaintiff. Uhler Decl. at ¶ 10. The violations alleged by Plaintiff could be considered ongoing because the same individuals were repeatedly involved in Plaintiff's complaints. Thus, there is an issue of fact as to whether "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Freeman v. Goord*,

2004 WL 2002927, *5 (S.D.N.Y. Sept. 8, 2004) (citation omitted).  The Court therefore recommends that Plaintiff's supervisory liability claims against Defendant Uhler be permitted to proceed, and that Defendants' Motion on this point be denied.

## IV.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 435) be **denied**; and is further

**RECOMMENDED**, Defendants' Cross-Motion for Summary Judgment (Dkt. No.485) be **granted in part and denied in part as set forth above**; and is further

**RECOMMENDED**, that Plaintiff's claims set forth in causes of action 1, 2, 4, 5, 6, 7, 8, and 9 be **dismissed** in their entirety; and it is further

**RECOMMENDED**, that the failure to protect claims set forth in cause of action 3 be **dismissed** as to Defendants Fischer and Bellnier, but proceed to trial as to Defendants Rock and Uhler; and it is further

**RECOMMENDED**, that the Plaintiff's Eighth Amendment use of force claims set forth in cause of action 12, arising out of the incidents of July 31, 2010; August 3, 2010; and November 5, 2010, be **dismissed**, but that the use of force claims arising out of the incidents on June 15, 2010; April 23, 2011; May 19, 2011; May 25, 2011; August 23, 2011 and September 9, 2011 proceed to trial; and it is further

**RECOMMENDED**, that the Plaintiff's First Amendment retaliation claims, set forth in cause of action 10, against Defendants Labarge and Scott as set forth in paragraph 105 of

the Amended Complaint be **dismissed**, but that the remaining First Amendment claims against Defendants Sarniak, Salls, Wood, Derouchie, Gokey, Gettman, Ramsdell, Clark, Sisto and Uhler, proceed to trial; and it is further

**RECOMMENDED**, that the Plaintiff's Due Process claims, set forth in cause of action 11, against Defendant Uhler regarding the September 23, 2011 disciplinary hearing proceed to trial, but that the remaining due process claims be **dismissed**; and it is further

**RECOMMENDED**, that in light of the forgoing recommendations, the following Defendants be **dismissed** from this action: Joseph Bellnier; Mark Boyd; Trevor Dunning; Michael Eddy; Brian Fischer; Brian Fournier; Matthew Gervais; Jeffrey Hyde; Clarence Labarge; A. Lashway; John Leclair; Albert Prack; Richard Rakoce; R. Scott; Darrin Snyder; Andrew Street; James Sorrells; and Bradley Thompson;[17] and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days[18] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

---

[17] By previous order of the Court, Defendants Southworth and Nephew have been dismissed on consent of the parties. Dkt. No. 589. Plaintiff has also agreed to a dismissal against Bradley Thompson. Dkt. No. 566-3.

[18] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   March 16, 2018
       Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

-67-