**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JESSIE J. BARNES,

                                    Plaintiff,

                                                            1:13-CV-0164
              v.                                                 (DJS)

DAVID A. ROCK, et al.,

                                    Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

JESSIE J. BARNES
Plaintiff *Pro Se*
09-B-2707
Mid-State Correctional Facility
P.O. Box 2500
Marcy, New York 13403

NIXON PEABODY LLP                         DANIEL J. HURTEAU, ESQ.
Pro Bono Trial Counsel for Plaintiff      TRAVIS HILL, ESQ.
677 Broadway                              SARAH L. TUFANO, ESQ.
10th Floor                                CHRISTOPHER J. STEVENS, ESQ.
Albany, New York 12207                    VINCENT D. NGUYEN, ESQ.

HON. LETITIA JAMES                        MELISSA A. LATINO, ESQ.
Attorney General of the State of New York WILLIAM A. SCOTT, ESQ.
Attorney for Defendants                   STEVE NGUYEN, ESQ.
The Capitol                               Assistant Attorneys General
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

**DECISION and ORDER**

## I.  INTRODUCTION

This long-running civil rights case arises out of a series of use of force events that occurred involving Plaintiff Jessie Barnes and corrections officers at the Upstate Correctional Facility between June 15, 2010, and September 9, 2011.  Dkt. No. 1, Compl.; Dkt. No. 186, Am. Compl.  According to the pleadings and proof, Plaintiff sustained various injuries because of these incidents, including a broken leg and a partially amputated finger.  After the Complaint was originally filed on February 12, 2013, an extensive period of discovery commenced, amendments were made, and motions followed.  As a result of Defendants' Cross-Motion for Summary Judgment filed on April 21, 2017, Dkt. No. 485, this Court issued a Report-Recommendation and Order which recommended granting in part and denying in part the Defendants' Motion, Dkt. No. 590. That Report-Recommendation was adopted by United States District Court Judge Gary L. Sharpe on September 28, 2018.   Dkt. No. 609.

As a result of those Decisions and Orders, numerous claims remained against over fifty Defendants.[1]  First, there were claims that on six occasions – June 15, 2010, April 23, 2011, May 19, 2011, May 25, 2011, August 23, 2011, and September 9, 2011 – certain Defendants used excessive force against Plaintiff in violation of Mr. Barnes' rights under the Eighth Amendment.  As to each of those incidents, Plaintiff also asserted that another

---

[1] One Defendant, Michael Yaddow, passed away prior to trial.  Dkt No. 685.  His case was then severed from the others as part of this Court's pretrial Order.  Dkt. No. 714 at p. 4.  No motion was made to substitute a representative of Defendant Yaddow within 90 days of the Notice of Death, and accordingly, the Court dismissed Plaintiff's claims against  Defendant Yaddow on November 8, 2022.  Dkt. No. 762.

group of Defendants were aware of the use of excessive force but failed to intervene to stop it.  Next, Plaintiff alleged that on several occasions Defendants retaliated against him for exercising his constitutional right to file grievances about things he alleged were happening at Upstate Correctional Facility in violation of his First Amendment rights. Plaintiff also alleged that Defendant Uhler did not act as an impartial hearing officer during certain disciplinary hearings in violation of his right to due process under the Fourteenth Amendment. Finally, Plaintiff claimed that several Defendants were aware of some or all of these incidents because of their supervisory positions at Upstate Correctional Facility but failed to take action to remedy the violation of his rights and to protect Plaintiff.

As the case progressed, the parties consented to jurisdiction before this Magistrate Judge.  Dkt. No. 644.  There were several attempts to resolve this matter prior to trial, but those efforts were ultimately unsuccessful.  *See* Text Minute Entries dated May 12, 2016, July 19, 2019, & August 7, 2020.  The matter was further delayed during the Covid-19 pandemic, but ultimately went to trial in September 2022.  Plaintiff was appointed pro bono counsel to assist him at trial.  Dkt. Nos. 638 & 682.  The trial lasted for nine days, including three days of jury deliberations.  Dkt. Nos. 783-785, 787-788.  At one point during deliberations, the jury indicated that they were deadlocked on two of the claims, Dkt. No. 742, but ultimately returned a verdict in favor of the Defendants and against Plaintiff Jessie Barnes.  Dkt No. 746.

Presently before the Court is a Motion by Mr. Barnes, acting *pro se*, requesting a new trial pursuant to FED. R. CIV. P. 59 because of various trial errors and deficiencies

that he alleges prejudiced him.  Dkt. No. 760; *see also* Dkt. No. 772.  Counsel for the Defendants oppose the Motion for New Trial.  Dkt. No. 774.  Defendants have also filed a Bill of Costs in the amount of $57,929.33.  Dkt. No. 754.[2]

## II. RULE 59 MOTION

## A. STANDARD OF REVIEW

Under Rule 59(a), a court may "grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), "including if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012).  As the Second Circuit has noted:  "a decision is against the weight of the evidence . . . if and only if the verdict is [1] seriously erroneous or [2] a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).  On a Rule 59 motion for a new trial, the court "is free to weigh the evidence . . . and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.'" *Id*. (quoting *Dunlap-McCuller v. Riese Org*., 980 F.2d 153, 158 (2d Cir. 1992)).  Although a court "may weigh the evidence and the credibility of witnesses" when considering a Rule 59 motion, "a judge should rarely disturb a jury's evaluation of a witness's credibility, . . . and may not freely substitute his or her assessment of the credibility of witnesses for that

---

[2] Plaintiff has filed other miscellaneous motions which, as a result of the trial and entry of judgment, are now moot. Dkt. Nos. 664, 665, 678, & 723.  Likewise, pending letter requests related to the Motions addressed by this Opinion are also moot.

of the jury simply because the judge disagrees with the jury." *Raedle v. Credit Agricole Indosuez*, 670 F.3d at 418 (citation and internal quotation marks omitted).

## B. DISCUSSION

### 1. Shackling of the Plaintiff

Plaintiff Barnes initially objects to the fact that his legs were shackled during the trial, which he believes created prejudice against him in the eyes of the jury and mandates a new trial. Dkt. No. 760 at pp. 3, 5, & 18. While courts should attempt to minimize the need to do so, "[t]he trial court has discretion to order physical restraints if the court has found those restraints necessary to maintain safety or security." *Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995). When it is necessary, "[t]he court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints." *Id.*

Mr. Barnes contends that the Court failed to hold a hearing on this issue as required by Second Circuit precedent. As to the latter, Mr. Barnes is mistaken. Prior to the jury being selected, the Court held a conference with all counsel regarding this very issue. Dkt. No. 784, Transcript, at pp. 3-5. The Court solicited the input from the DOCCS security staff who had the responsibility of maintaining control of Mr. Barnes, and their recommendation was to have Mr. Barnes remain in leg irons but allow the handcuffs to be removed. *Id.* This Court recognized that the request of the security staff was merely advisory, and that the ultimate decision to balance court security with the interests of the Plaintiff, rested with the Court itself. *Id.* The Court had already viewed videos of the events in question and considered Plaintiff's disciplinary history Plaintiff in connection

5

with prior Motions.  *See* Dkt. Nos. 435, 485, & 714.  As such, the Court was intimately familiar with the numerous undisputed incidents that Mr. Barnes has had with correctional staff during his lengthy incarceration.  These included assaults on staff, involving biting, spitting, and threats of severe violence.  *See* Report-Recommendation and Order at pp. 24-25; Dkt. No. 710, Defs.' Proposed Trial Exhibits # 5, 7, 13, 24, 26, & 30.  Mr. Barnes is serving a thirty-five year to life prison sentence, and because of disciplinary problems he has had many years of SHU confinement.  Indeed, his disciplinary history was, at the time of trial, 38 pages long.  Exhibit D-26.  Because of Plaintiff's disruptive behavior, his cell door was affixed with a fixed protective hatch cover, and at certain times during his incarceration, when he was moved within the prison it was with the use of a retention strap attached to his handcuffs and while being recorded.  Exhibits D-18 & 20.

On the other hand, Mr. Barnes has appeared in front of this Court on several occasions.  While some of Mr. Barnes' written submissions have been vitriolic and extreme, his conduct before this Judge always has been courteous, even in circumstances where Mr. Barnes became agitated and upset. The Court also considered the fact that the jury would be aware that Mr. Barnes was incarcerated because it was central to his claim and would see numerous videos of Plaintiff Barnes while in custody, and at all times he was in restraints.[3]

---

[3] When discussing the matter of leg shackles with Mr. Barnes, Plaintiff recognized that because of the nature of his claim, the jury would understand that he is presently incarcerated, with all that entails:  "You know, that's why I was going to just wear my greens because it's not secret I got life. So I ain't got nothing to hide."  Transcript at p. 22.

Based upon all this information, the Court concluded that to maintain order and security in the courtroom it was appropriate to have Plaintiff's leg restraints remain in place, but to allow Mr. Barnes to have his hands free so that he could take notes and communicate with his counsel.  Transcript at p. 3.  No objection to this proposal was made by either side, but modifications were requested and granted.  *Id.* at pp. 3-5, 21. Mr. Barnes was to be seated in between two members of his counsel; the counsel table was solid so that the jury would not be able to see Plaintiff's legs or restraints; he was assigned the counsel table farthest away from the jury; and Plaintiff was called into the courtroom and placed in the witness stand prior to the jury being called in, thereby preventing jurors from seeing Mr. Barnes walking with leg shackles on.  *Id*. at pp. 5, 21. Staff from the Department of Corrections and Community Supervision sat behind Mr. Barnes during the trial.  As the record generally reflects on each occasion Mr. Barnes either took the stand, or left the courtroom, the jury was excused prior to that event.  *See* Transcript at pp. 137-138; 185; 200; 201; 248; 250-251; 290; 338; 361; 363; 428; 429; 466; 470; 472; 525; 580-581; 635; 690; 694; 704; 766; 798; 876; 886; 892; 934; 942; 1138; 1141; 1172; 1227-1228; & 1240.  Mr. Barnes was not placed in a position where the Jury would be able to see any leg shackles, including those times that he was on the stand, or when he requested to leave the court room to return to his holding cell because of the disquieting nature of the testimony, or during disputes he had with counsel.

Under the circumstances set forth above, the Court denies Plaintiff's request for a new trial upon the grounds that he had non-visible leg restraints affixed during the proceedings. *See Davidson v. Riley,* 44 F.3d 1118, 1122–23 (2d Cir. 1995) ("the trial court

has discretion to order physical restraints on a party or witness when the court has found those restraints to be necessary to maintain safety or security; but the court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints."); *see also United States v. Melendez*, 2022 WL 3640449, at \*5 (2d Cir. Aug. 24, 2022) ("The district court followed the proper procedure and acted within its discretion in ordering Jones to wear concealed leg shackles during trial after considering Jones's disciplinary history, the severity of the sentence he faced, and the recommendation of the U.S. Marshals Service that Jones should be restrained.").

### 2. Admission of Plaintiff's Disciplinary History

Plaintiff requests a new trial based upon the fact that "bad act" evidence was submitted before the jury, including 25 years of his disciplinary history. Dkt. No. 760 at pp. 1-5, 13, 28. When considering the Defendants' in limine Motion to allow admission of Plaintiff's prior disciplinary history, the Court reserved, but indicated that some of the disciplinary history may well be relevant. Dkt. No. 714, Pre-Trial Order, at pp. 3-4. As one part of his many claims, Plaintiff asserted that the five-year SHU penalty imposed by Defendant Uhler as a result of the August 23, 2011 incident was excessive and improper. Am. Compl. at ¶¶ 107-112. Defendant Uhler denied the allegations and maintained that the sentence imposing further disciplinary housing was appropriate considering Mr. Barnes' significant prior disciplinary history. Transcript at pp. 1056- 1057. Plaintiff also claimed that Uhler retaliated against him with respect to his handling of Plaintiff's disciplinary matters. Am. Compl. at ¶ 105. Uhler also denied this claim. Transcript at

pp. 1056-1057.  In such a mixed motive case, the jury may well be entitled to hear not only the hearing officer's reasons for imposing the sentence, but also to see the related factual information.  Pretrial Order at p. 3 ("Likewise, to the extent Plaintiff's due process claim rests to some degree on the severity of the punishment imposed his prior disciplinary history might well be relevant there as well."); *see also Colon v. Howard*, 215 F.3d 227, 234-35 (2d Cir. 2000) ("this information was part of the reason for the penalty that [the] Hearing Officer . . . assessed, and was relevant at least to disprove [plaintiff's] allegation of partiality on [defendant's] part.").  In fact, Mr. Barnes and his appointed counsel discussed this very issue and counsel suggested that, in light of this fact, Mr. Barnes should consider dropping the due process claim.  Dkt. No. 760 at p. 29.  Mr. Barnes did not agree to do so.

Faced with the Court's pretrial ruling, and the continued existence of the due process claim, it appears that Plaintiff and his counsel made a strategic decision to address Plaintiff's disciplinary history up front with the jury.  Transcript at p. 164 ("I got like 30 years in the box now.").  They did so in a way which attempted to bolster the argument that the force used against Mr. Barnes during his detention at Upstate Correctional Facility was based upon corrections officers' dislike of him and because they considered him to be a problem inmate.  Transcript at pp. 709-710 (Mr. Barnes "[had] the reputation of a troublemaker or a rabble-rouser.").  Accordingly, Plaintiff's counsel argued that the force used in Mr. Barnes' case was done maliciously and sadistically. This was an argument that was dove tailed into Attorney Travis Hill's closing.  *See* Transcript at pp. 1190 ("And during his time at Upstate, and you've heard the testimony from many of the

officers that they didn't like Mr. Barnes, that he was a problem inmate."); Tr. at pp. 1205 ("he had a reputation as being difficult, and these officers knew it, and they were retaliating against him.").

Defense counsel did stipulate to the admission of a printout of Plaintiff's disciplinary history (Exhibit D-26) which, as noted above, was quite lengthy. Plaintiff himself was upset by this fact:

> THE PLAINTIFF: That's a bit extreme. It's from different [DIN] numbers. There is absolutely -- you know, because when they asked me the questions about me having assaults, I said that it happened. I don't know if it was five. I had admitted that incident had occurred, that I had assaulted somebody. So the jury know that. They knew that. When I was on the stand, I admitted that I had bit a man. They see that.  So they wouldn't need to go through a laundry list of stuff that happened 25 years ago and draw these prejudicial inferences against me about something that happened in 2000 that had absolutely nothing to do with the incident that hadn't yet occurred in 2010 and 11. That wouldn't make sense, sir. That would be very, very, very prejudicial to me.

> THE COURT: I certainly do understand your argument with regard to the prejudicial nature of the entire disciplinary history going in.

Transcript. at p. 471.

Prior to the disciplinary history being shown to the jury as a Joint Exhibit, the Court heard, *and granted*, the request of Plaintiff's counsel to withdraw their stipulation upon the grounds that the disciplinary history, in total, was unduly prejudicial. Transcript at pp. 694-695.  Plaintiff requested that the portion of the disciplinary history admitted be limited to the time he was housed at Upstate Correctional Facility from late 2009 until 2012 at the latest.  *Id*.  The Court granted that Motion despite the prior stipulation, and agreed to a redacted disciplinary history that included only discipline from September 5,

2009 to September 23, 2011.  Transcript at pp. 701-704.   This was history that would have been considered by Defendant Uhler in assessing an appropriate penalty for Mr. Barnes' misconduct and would also be relevant to the issue of damages.  *Id.*

Therefore, Plaintiff's argument for a new trial upon the grounds that his counsel stipulated to the admission of 25 years of "bad act" disciplinary history, is simply misplaced. The record reflects that any such stipulation was withdrawn, and the Court granted Plaintiff's request to limit the time period for the admission of prior discipline. This was all completed prior to Exhibit D-26 being presented at trial.

Plaintiff's other arguments concerning exhibits, which videos were played and when, the decision to not present a rebuttal case, and the decision not to attempt to introduce the Amended Complaint as evidence, have all been considered by the Court but do not warrant the granting of a new trial, as they did not affect substantial justice.  *Toliver v. New York City Dep't of Corr.*, 202 F. Supp. 3d 328, 341 (S.D.N.Y. 2016) ("With respect to strategic and tactical decisions concerning the conduct of trials, including decisions regarding which evidence to introduce, parties are deemed to repose decision-making authority in their lawyers. Even assuming, *arguendo*, that Plaintiff's lawyers did not, for whatever reason, carry out Plaintiff's wishes, none of the errors alleged by Plaintiff remotely threatened a miscarriage of justice or a seriously erroneous outcome, the usual bases for a new trial. The Court concludes that whatever complaints Plaintiff might have regarding his counsel's performance, neither a new trial nor alteration of the judgment is an appropriate remedy for those complaints. Accordingly, the Court denies Plaintiff's motion pursuant to Rule 59.") (internal quotations, alterations, and citations omitted).

*3. Rule 50 Rulings*

Plaintiff also seeks a new trial based upon this Court's dismissal of certain claims and/or Defendants in response to defense counsel's Rule 50 Motion at the close of Plaintiff's proof.  Particularly egregious, in Mr. Barnes's view, was the Court's dismissal of supervisory liability claims against Superintendent David Rock and Deputy Superintendent Donald Uhler.[4]   While various arguments and assertions against Defendants Rock and Uhler had been presented in the pleadings, and in connection with the pretrial filings, the testimony at trial in support of these claims was thin.  Plaintiff testified that, as to Defendant Uhler, after the August 23 incident he spoke with the Deputy Superintendent outside his cell. "I guess I told him what they had did to me." Transcript at p. 220.  As to Superintendent Rock, it was the testimony of Plaintiff that Rock was in the position to receive grievances, and that Plaintiff had in fact sent a complaint to him about Defendants Derouchie and Woods.  Transcript at pp. 166 & 169.  Pursuant to procedure, the Superintendent would normally assign the matter to the Deputy Superintendent to investigate.  Transcript at pp. 140, 141, & 166.

In opposition to Defendants' Rule 50 Motion, Plaintiff's counsel argued that Rock and Uhler were notified of misconduct by corrections officers, but despite their positions, they failed to protect the Plaintiff.  Transcript at pp. 349-350.  There was no specific evidence of what was done with any particular grievance; whom the Superintendent would have assigned to investigate a filed grievance by Barnes; what any such

---

[4] A separate due process claim against Defendant Uhler was allowed to proceed.

investigation disclosed; or what was reported back to the Superintendent or Deputy Superintendent. Plaintiff himself was not aware of this information. *See* Transcript at pp. 167-168. Nor was it shown how the need for any different investigation could be causally related to the Plaintiff's claims. For example, when Plaintiff spoke with Defendant Uhler, the August 23, 2011 event had already occurred. In sum, no non-conclusory evidence was presented in Plaintiff's case about what the Superintendent or Deputy Superintendent actually knew, or how they acted or failed to act with either deliberate indifference to a serious risk of harm, or how they authorized force be used maliciously or sadistically.

In 2020, the Second Circuit clarified that to establish liability against a correctional official, a plaintiff must prove that the defendant was personally involved in a constitutional violation and not simply that, in his or her supervisory position, it was possible that his supervision was, for example, grossly negligent. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("We join these circuits in holding that after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "Accordingly, for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* at 616. This standard of proof was not met at trial, and therefore granting of the Rule 50 Motion on these claims was appropriate.

As part of the Rule 50 Motion, the Court also granted dismissal of certain claims against some Defendants, and dismissed all claims against Defendants Boyd, Currier, A. Johnson, Keating, and Tuper. *See* Transcript at pp. 362-363; Dkt. No. 747. Plaintiff complains about the dismissal of retaliation claims against B. Clark., G. Gettman, and T. Ramsdell. Dkt. No. 760 at pp. 47-48. The Court did dismiss the retaliation claims against Gettmann arising out of the August 23, 2011 incident because the grievance that the Plaintiff wrote and relied upon in support of the retaliation claim, was not received until after that date, *see* Transcript at pp. 208-211, 353, & 362. The Court also dismissed the retaliation claims against Defendant B. Clark and Defendant Ramsdell relating to the September 9, 2011 finger amputation incident, Transcript at p. 363, as there was no admissible evidence of retaliatory intent for that incident offered at trial.

### 4. Ineffective Assistance of Counsel

A substantial portion of Plaintiff's request for a new trial is predicated upon the argument that his appointed counsel were ineffective. *See* Dkt No. 760 at pp. 28, 30, & 38. In support of that assertion, Plaintiff cites to the Sixth Amendment of the United States Constitution. *Id.* The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The most direct answer to Plaintiff's argument presented in this Motion, therefore, is from the Second Circuit itself: "To the extent that [Plaintiff] argues that the judgment should be reversed because [his] first attorney was ineffective, this argument is meritless because, 'except when faced with the prospect of imprisonment, a litigant has no legal right to counsel in civil cases' -- and, by extension, no right to effective counsel.

*Cousar v. New York-Presbyterian Queens*, 845 F. App'x 34, 37 n.2 (2d Cir.), *cert. denied*, 142 S. Ct. 412 (2021); *see also Singh v. Home Depot U.S.A., Inc.*, 580 F. App'x 24, 25 (2d Cir. 2014) ("a lawyer's purported shortcomings present no cognizable ground for relief in a civil matter, where the Sixth Amendment right to counsel does not apply."); *Espaillat v. Cont'l Express, Inc.*, 33 F. App'x 567, 568–69 (2d Cir. 2002) ("Ineffective assistance of counsel is not a proper ground for relief in a civil matter.").

Even if the Court found it appropriate to apply the effective assistance of counsel test applicable in criminal cases, the members of the Nixon Peabody team far surpassed that standard.  "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'"  *Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland v. Washington*, 466 U.S. at 689).   Establishing prejudice requires Petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. at 694.  The *Strickland* test imposes a "high bar."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

In the Court's view, the Plaintiff was substantially aided in the presentation of his claims by highly competent trial counsel.  Because of the number of discrete events at

issue, and the vast breadth of Plaintiff's *pro se* Complaint, representing Mr. Barnes in this matter was always going to be a substantial task. Throughout the course of litigation, the Court has attempted to assist Mr. Barnes to navigate through the discovery process and had previously appointed counsel for him to consider a settlement proposal. Dkt No. 619. Mr. Barnes complained bitterly regarding that counsel's assistance. *See* Dkt. Nos. 620 & 621. Next, the Court appointed Adam Shaw, a partner in the law firm of Boies, Schiller & Flexner LLP, with years of litigation experience, to represent Mr. Barnes at trial. Dkt. No. 638. Mr. Barnes relationship with that counsel went quickly downhill, and he made numerous requests to have that counsel terminated. Dkt. Nos. 646, 649, 650, & 651.

It is against this backdrop that the Court appointed Daniel Hurteau of Nixon Peabody, a very experienced trial attorney, to represent Mr. Barnes. Mr. Hurteau worked tirelessly to advance a compelling and comprehensive case. As a partner with Nixon Peabody, Mr. Hurteau utilized numerous attorneys in the firm throughout the state to assist him. The lawyers effectively prepared for trial by submitting comprehensive pretrial submissions. When it was discovered that Mr. Barnes' daughter might have numerous relevant documents in her possession that Plaintiff had sent to her throughout the years, counsel arranged to obtain the evidence and review it. *See* Dkt. No. 688. During trial, the attorneys from Nixon Peabody coordinated with Plaintiff Barnes to make the process go smoothly, even to the point of buying Mr. Barnes lunch every day so that he would feel confident in the food he was provided while he was in custody.[5]   Mr.

---

[5] This conduct by counsel, observed by the Court, stands in stark contradiction to the Plaintiff's present assertion that his appointed attorneys showed little or no regard for him as a human being.

Hurteau's team presented gripping opening and closing statements; effectively cross-examined the substantive witnesses; raised appropriate objections; utilized the time before the jury in a considerate and effective manner; and, in short, provided stellar representation.  While the end result was not the one that Mr. Barnes had hoped for, or felt that he deserved, it was a close case and the jury obviously struggled for days and hours with many aspects of his claims.  Mr. Barnes had a full and fair opportunity to present himself and his claims to that impartial body.

Mr. Barnes' claims that his counsel was ineffective at trial are not supported for several reasons.  Initially, Mr. Barnes maintains that Mr. Hurteau was somehow biased against him because he was born at Alice Hyde Medical Center in Malone, New York.  Dkt. No. 760 at pp. 1 & 38.  Although not specifically stated, it appears that Mr. Barnes is implying that because his appointed counsel was born in upstate New York, he must have been conspiring and collaborating with the Defendant corrections officers who also may have been born in upstate New York.  Mr. Barnes demanded that Mr. Hurteau identify who his friends were, and it appears that Mr. Hurteau rightfully declined to do so.  Dkt. No. 760 at p. 12.  None of this rank speculation by Plaintiff establishes any impropriety on the part of pro bono counsel, and indeed counsel's spirited representation of Mr. Barnes throughout the course of the case belies this very assertion.

Plaintiff asserts that counsel was deficient because he did not seek to introduce the Plaintiff's Amended Complaint as evidence.  The Court would not likely have allowed such an exhibit to be received if offered by Plaintiff.  First, the admission of such a pleading would cause substantial confusion, and possibly prejudice to the Plaintiff, as the

Amended Complaint contained numerous claims and defendants that were no longer in the case at the time of trial, which would have to be explained to the jury.  In addition, all the statements and legal assertions from Plaintiff contained in the *pro se* pleading that he intended on using, would be inadmissible hearsay.  While Plaintiff's statements in the pleading could be used by defense counsel to impeach the Plaintiff himself, *Bermudez v. City of New York*, 2019 WL 136633, at *16 (E.D.N.Y. Jan. 8, 2019), they were not admissible simply to bolster Plaintiff's in-court testimony, or to fill in evidentiary holes in the case that may have existed.

Plaintiff's remaining claims are similarly unavailing.  Plaintiff objects to the fact that his counsel refused to admit as evidence the video tape of the August 23, 2011 event.  *See* Dkt. No. 760 at p. 34.  In fact, that tape was admitted during the trial, Transcript at pp. 1069-1070, 1139, and the Jury viewed it again during their deliberations, Transcript at p. 1214.

Whether to offer a rebuttal case was within the discretion of the trial attorney, *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987), and there is no showing by Plaintiff that anything that could have been submitted in rebuttal would have changed the outcome of the case.

Finally, Plaintiff asserts that the transcripts of his Tier III Disciplinary Hearings, D-48, should not have been admitted at trial.  Dkt. No. 760 at p. 29.  At one point Plaintiff asserted that these records were inadmissible because they were not signed.  Transcript at pp. 891 & 935.  However, Defendant Uhler specifically testified that he had reviewed the transcripts, and that they were fair and accurate.  Transcript at pp. 1045-1050.  The

transcripts reflected evidence that was clearly relevant to Plaintiff's claims, in particular when and in what manner Plaintiff was removed or left the disciplinary hearings that related to the August 23, 2011, and September 9, 2011, incidents.  *See* Transcript at pp. 1055-1059; Exhibit D-48 at p. 747.

In sum, none of Plaintiff's arguments - whether taken singly or in combination - raises a possibility that the jury verdict in this case was "seriously erroneous" or a "miscarriage of justice."  *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). The Court therefore denies Plaintiff's motion for a new trial.

### III. BILL OF COSTS

As a result of the favorable verdict, Defendants seek $1,421.20 in transcript costs, as well as $56,508.13 for witness fees and lodging, for a total of $57,929.33.  Dkt. No. 754.  Plaintiff concedes that he owes that amount for transcripts, but objects to the remaining costs as excessive.  Dkt. No. 765.

Federal Rule of Civil Procedure 54(d)(1) states in relevant part that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." "[T]he Supreme Court has held that the term 'costs' includes only the specific items enumerated in 28 U.S.C. § 1920." *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir. 2001), *abrogated on other grounds by Bruce v. Samuels*, 577 U.S. 82 (2016). Section 1920 provides that the following costs are taxable: (1) fees of the clerk and marshal; (2) fees for transcripts "necessarily obtained for use in the case"; (3) fees for printing and witnesses; (4) fees for exemplification and copying costs "where the copies are necessarily obtained for use in the case"; (5) docketing fees under 28 U.S.C. §

1923; and (6) fees for court-appointed experts and interpreters. 28 U.S.C. § 1920. "The burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified." *Cohen v. Bank of N.Y. Mellon Corp.*, 2014 WL 1652229, at *1 (S.D.N.Y. Apr. 24, 2014) (quoting *John G. v. Bd. of Educ.,* 891 F. Supp. 122, 123 (S.D.N.Y. 1995)). "[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception." *Whitfield v. Scully*, 241 F.3d at 270 (internal quotation omitted).

Under the Prison Litigation Reform Act, courts have the authority to assess costs against an indigent prisoner. *See* 28 U.S.C. § 1915(f)(2)(A) & (B). This authority lies within the discretion of the trial judge. *See* 28 U.S.C. § 1915(f)(2)(A) ("If the judgment against a prisoner includes the payment of costs under this subsection, the prisoner shall be required to pay the full amount of the costs ordered."); *see also Keesh v. Smith*, 2008 WL 2242622, at *3 (N.D.N.Y. May 29, 2008) ("[D]istrict courts retain discretion to limit or deny costs based on indigency.").

"[T]he discretionary imposition of costs should be informed by any factor the court deems relevant, including the purpose of the *in forma pauperis* statute, the history of the party as litigator, good faith and the actual dollars involved." *Feliciano v. Selsky*, 205 F.3d 568, 572 (2d Cir. 2000) (internal quotation omitted). As to indigency, "[c]ourts in this circuit typically only deny costs based on indigency for plaintiffs who are unemployed or make just pennies an hour working in correctional facilities." *Rowell v. City of New York*, 2022 WL 627762, at *1 (S.D.N.Y. Mar. 3, 2022).

Mr. Barnes is clearly indigent, and while the Plaintiff has a significant history of litigation, the Court feels that this case was pursued in good faith and was premised upon serious injuries that Mr. Barnes sustained while in custody.  As a result, and in an exercise of discretion, the Court limits the award of costs simply to the transcript fees.

### IV.  CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that Plaintiff's Motion for a New Trial (Dkt. Nos. 760) is **DENIED**; and it is further

**ORDERED**, that Plaintiff's Motions (Dkt. Nos. 664, 665, 678, 723, 753, & 757) are **DENIED as moot**; and it is further

**ORDERED**, that Defendants' Motion for a Bill of Costs (Dkt. No. 754) is **GRANTED** in the amount of $1,421.20 and is otherwise **DENIED**, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order upon the parties to this action.

**IT IS SO ORDERED**.

Dated:   April 4, 2023
          Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge